756 F.2d 320
 R.A. GILBERT, Trustee, Appellee,
v.
SCRATCH 'N SMELL, INC., Appellant.
In re The WASHINGTON GROUP, INC., Washington Mills Company,
Washington Yarn Corporation, (formerly Johnston Mills Co.),
Johnston Mill Company, Johnston Mills Export Company, Ltd.,
Spinners Processing Company, Washington Weaving Company and
Washington Mills Sales Corporation, Debtors.
 No. 84-1455.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 4, 1984.
Decided March 4, 1985.
 
 Daniel R. Wotman, New York City (Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, Horton, Hendrick & Kummer, Winston-Salem, N.C., on brief), for appellant.
 Norwood Robinson, Winston-Salem, N.C. (Jeffrey C. Howard, Petree, Stockton, Robinson, Vaughn, Glaze & Maready, Winston-Salem, N.C., on brief), for appellee.
 Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and DUPREE, Senior United States District Judge for the Eastern District of North Carolina, sitting by designation.
 MURNAGHAN, Circuit Judge.
 
 
 1
 It is not just a truism, more honored in the breach than in the observance, that the trial court, not the appellate court, is where disputes of fact are resolved. The losing party understandably considers the decision wrong, but, if he takes an appeal, to succeed he must be prepared to demonstrate that a prejudicial error of law has occurred. The belief that the factual issues were wrongly decided, even very wrongly decided, may often fuel the machine for launching the appeal, but, so far as sufficiency of the evidence to support the factual findings is concerned, save for cases falling within a very small exception, the appeal is foredoomed to fail.
 
 
 2
 That small exception occurs when the evidence relied on in the trial court for the unfavorable factual decision is demonstrated to have so little, if any, weight or strength that, as a matter of law, it can be deemed to have no significance. Regrettably, many, if not most, losing parties have assessed their cases as so strong, and those of their opponents as correspondingly so weak, that they are willing to risk time and money in the belief that the very small exception must apply.
 
 
 3
 Appellate judges consequently are obliged to sift through records in review of the frequently verbose proof to ascertain whether there was indeed no sufficient credible evidence to sustain the factual determinations made at the trial court level. Thus, at no little price in time and effort, we assure that every litigant willing to pay for it shall have that full day in court which is a hallmark of our judicial system.
 
 
 4
 In the individual case, that all seems straightforward and reasonable. In the aggregate, however, the great number of ill-advised appeals claiming that the fact-findings were erroneous threatens the viability of the entire system. It is perhaps too much to ask of individual legal practitioners that they pause to consider the long-range greater good to be obtained through sacrifice of the short-term benefit of a fee to represent a client in a usually forlorn appeal. However, while the hope for relief is slight, we do utilize the opportunity of the present appeal to remind lawyers that there is a risk, though they seldom take a step back to look and perceive it, that they may be killing the goose that lays the golden egg. The court system prevalent in these United States provides low-cost tribunals for the hearing and resolution of disputes. As with other good things in life, if undue advantage is taken, it can only be a matter of time before the benefit is diminished, or even, in some respects, may disappear.
 
 
 5
 Before us here is a case which many of us, lawyers and lay people alike, may perceive to have been wrongly decided. Washington Mills Company was a supplier of t-shirts to Scratch 'N Smell, Inc. With respect to one order for 63 dozen shirts, the parties haggled, in advance of delivery of t-shirts, over the price. Washington Mills insisted on the "current market price" of $7.50 per dozen. The parties settled, however, for $6.75/dozen. Washington Mills nevertheless billed for the t-shirts at the $7.50 rate.
 
 
 6
 Scratch 'N Smell fell behind in payment, regardless of which rate was in effect. When Washington Mills pressed for payment, not surprisingly Scratch 'N Smell raised several dissatisfactions to account for its falling behind: a) shipment of incorrect sizes, b) incomplete shipments, c) excessive defective items, d) shipments not consistent with instructions, and e) inaccuracies in billing invoices. Although the price discrepancy had earlier been raised by Scratch 'N Smell, for some reason it did not surface in the main body of the ensuing negotiations. The parties, with the assistance of lawyers, worked out a settlement by which an amount to be paid by Scratch 'N Smell, by cash and by promissory note enhanced by a Security Agreement, was fixed and, in return, Washington Mills was a) to extend a line of credit, b) to make allowances with respect to certain merchandise, delivery of which could not be authenticated, c) to accept back for full credit certain returns if made within seven days, d) to make an allowance for a limited amount of defective and damaged merchandise, e) to assist in disposition of Scratch 'N Smell's defective and damaged merchandise, and f) to supply a letter of its president and an opinion of counsel affirming the validity of the agreement.
 
 
 7
 Nothing to that point in the negotiations had been made by Scratch 'N Smell of the overbilling claim. As the lawyers were putting the agreement in final shape for execution, according to the testimony of a principal of Scratch 'N Smell, the subject of overbilling was raised between him and a Washington Mills representative. He further testified that there ensued a promise that credit would be forthcoming if investigation confirmed that one was due.
 
 
 8
 The Washington Mills representative confirmed that testimony, explaining that he doubted the existence of a valid claim for overbilling, but, anxious not to have the settlement agreement blow up just when it was about to be finalized, stated that he would check out the matter of overbilling. The Washington Mills representative, at some time after the parties had formalized, finalized and executed the agreement of March 31, 1976, confirmed the fact of overbillings, simply assuming that credit would, therefore, issue.
 
 
 9
 None was forthcoming, however, and here is where the otherwise compelling story of Albert Hochstadt, the Scratch 'N Smell principal began to show cracks in the veneer. At no time prior to June 20, 1977, the date Washington Mills went into bankruptcy, did Hochstadt assert any claim for overbilling, although business continued to be transacted by the two enterprises for that period of over a year, necessitating weekly contact between their executive personnel. Throughout, regular payments were made on the promissory note without any move by Scratch 'N Smell to withhold payment to the extent of the non-forthcoming credit for overbilling. In the bankruptcy proceeding, a proof of claim asserting a claim for the overbilling was filed by Scratch 'N Smell. But the step was taken only on June 12, 1978, after the executives of Washington Mills who had had the most to do with the matter had left Washington Mills and its parent, The Washington Group, Inc.
 
 
 10
 The bankruptcy judge and the district court, upon considering the evidence, were faced with two alternative possible explanations. One was that the parties were amenable to keeping alive the overbilling claim if it indeed had validity. The other was that they intended to achieve a complete settlement, so that they could start with a clean slate, without any outstanding unresolved claims from the past to cloud their relationship. While we might ourselves have opted for the former explanation, were we assigned the fact-finding responsibility, the bankruptcy judge and the district court, in deciding whether the bankruptcy judge's findings of fact were clearly erroneous, was each entitled to give weight to the following considerations in reaching the contrary conclusion:
 
 
 11
 1) The parties negotiated in a comprehensive way an agreement, the formulation of which was consigned to lawyers, from which a permissible inference could be drawn that they meant to resolve all outstanding differences.[1] It is such an inference which lies behind any invocation of the principle of the integrated contract and its corollary, the parol evidence rule.[2]
 
 
 12
 2) Actual execution of the March 31, 1976 agreement came after Hochstadt's conversation with a representative of Washington Mills about an overbilling claim, yet Hochstadt appears not to have alerted the lawyers to the existence of his claim. If he had indeed alerted them they, nevertheless, included nothing about the claim either in the formally prepared agreement, or in an addendum. That permitted the perfectly respectable inference that the claim had been abandoned. If, on the other hand, Hochstadt, even after the promise by Washington Mills to look into the matter, said nothing about the overbilling claim to those preparing the formal contract, it was to be inferred that he too was afraid to do anything to frustrate the coming into existence of the agreement and so consciously decided to let the claim evaporate rather than introduce a new and possibly unsettling element at a crucial point in the reaching of an agreement also of paramount importance insofar as Scratch 'N Smell was concerned.
 
 
 13
 3) Hochstadt's failure for well over a year after March 31, 1976 to assert a claim for overbilling occurring prior to March 31, 1976 was consistent with indeed reinforced a determination that he had agreed to and meant to put the past entirely behind him.
 
 
 14
 Since the inferences were entirely permissible we are in no position to conclude that the factual determination proposed by the bankruptcy judge and accepted by the district court was clearly erroneous. The appeal accordingly was without merit.
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 The March 31, 1976 agreement expressed the intention of the parties "to compromise any difference between us."
 
 
 [2]
 The contemporaneous security agreement provided:
 The Agreements contain the entire agreement between the parties and are binding on both parties and there are no understandings, agreements or representations, express or implied, not specified in those Agreements. All proposals, negotiations and representations made prior and with reference hereto are merged in said Agreements.