827 F.2d 101
 Margaret HAGGE, Plaintiff-Appellee,
v.
William BAUER, an individual; City of Oak Creek, a
Wisconsin Municipal Corporation; the Home
Insurance Company of Wisconsin, a
corporation, Defendants-Appellants.
 Nos. 86-1469, 86-2974.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 21, 1986.
Decided Aug. 17, 1987.
 
 1
 Ronald L. Piette, Piette, Knoll, Nelson S.C., Milwaukee, Wis., for defendants-appellants.
 
 
 2
 Thomas J. Crawford, Robert C. Crawford, Milwaukee, Wis., for plaintiff-appellee.
 
 
 3
 Before POSNER and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*
 
 
 4
 GRANT, Senior District Judge.
 
 
 5
 Margaret Hagge claimed that Officer Bauer kicked and stomped her leg. Bauer was one of five City of Oak Creek police officers responding to an early-morning call for help at the scene of domestic violence where Mrs. Hagge was the victim. As the officers attempted to restore order at the Hagge residence, neither Mr. nor Mrs. Hagge would cooperate peacefully. The officers arrested both Mr. and Mrs. Hagge, and as the officers led Mrs. Hagge to the patrol cars she suffered the injuries in issue. Mrs. Hagee's suit under 42 U.S.C. Sec. 1983 alleged police brutality, and the trial court ruled in her favor. Bauer, the City of Oak Creek and its insurer appeal from a judgment awarding Hagge $81,451.78 in compensatory damages, $25,000 in punitive damages, and attorney fees. We affirm the judgment of the district court. We also hold, without commenting further, that the district court did not abuse its discretion in denying Bauer's trial motions to dismiss for insufficiency of the evidence.
 
 
 6
 * After an evening of drinking with co-workers, Kenneth Hagge arrived at the Hagge residence in the early morning of September 22, 1983. He was drunk and belligerent. Upon kicking the entry door from its hinges, Mr. Hagge found his wife, Margaret, asleep in bed with the two Hagge children, Tina and Ken, Jr. Mr. Hagge threw a box at his wife, slapped her repeatedly, chased her to the bathroom and banged the door against her forehead as he barged through the bathroom. Ken, Jr., meanwhile, had succeeded in telephoning the Oak Creek police.
 
 
 7
 Officers Liegler, Schmidt, Hermann and Bauer arrived on the scene to inquire about Mrs. Hagge's safety. Upon answering the rap on the door, Mr. Hagge demanded that the officers get off his property. Sensing the gentlemen had reached an impasse in their communication, perhaps, Mr. Hagge slammed Officer Liegler in the chest, knocking him backwards into Officer Bauer. Bauer did Liegler the favor of pushing him back in the direction of the muscular Hagge. While Officers Schmidt and Hermann circled the house in an effort to reach Mrs. Hagge, Bauer, Liegler and Mr. Hagge wrestled on the stairs leading to the second floor. The four officers eventually removed Mr. Hagge from the house to resume the struggle in the yard. Mrs. Hagge then interfered with the officers' efforts; she either pushed or punched Bauer, so incensing him that he intended to place her under arrest. But before he could do so, all five officers (by then Officer Artka had arrived) were engaged in subduing and handcuffing Mr. Hagge.
 
 
 8
 Officer Bauer returned to the house to arrest Mrs. Hagge. Bauer led her out of the house, and, as he held the handcuffed Mrs. Hagge by the arm, she fell to the ground and suffered severe leg injuries. Specifically, Mrs. Hagge suffered spiral comminuted fractures of the left distal tibia and proximal fibula. At trial, Mrs. Hagge argued that Bauer kicked her in the leg, causing her to fall clumsily to the ground.
 
 
 9
 Officer Bauer testified that he was escorting Mrs. Hagge by her right arm, and, as Officer Schmidt approached to grab her left arm, she kicked up at Schmidt's face and lost her balance and fell. Schmidt testified that Mrs. Hagge kicked up at his face and he turned to avoid the kick. Liegler and Artka testified to the same. Liegler was positioned in the doorway, and Artka observed from the shoulders of Mr. Hagge, whom the officers had finally pinned to the ground. Hermann, however, could not see the incident because he was positioned on Mr. Hagge's legs and facing the other direction.
 
 
 10
 Bauer testified that, after Mrs. Hagge fell, she then kicked up at him and landed a blow to his groin area. In response, according to his own testimony, Bauer gave Mrs. Hagge a "snap-kick" in the buttocks and told her to "knock that shit off." Mrs. Hagge testified, on the contrary, that Bauer stomped on her ankle as she lay helplessly on the ground.
 
 
 11
 The trial court, Judge Reynolds presiding, resolved the conflicting testimony rather neatly in its Findings of Fact and Conclusions of Law by declaring that "Bauer did not tell the truth about what happened to Margaret, and the four other police observers distorted their testimony through selective memory in order to protect Bauer." Findings at 6. According to Judge Reynolds, "Margaret's legs were kicked into the air by William Bauer, and her legs reached a height of approximately 5'5"'." Id. She fell to the ground "on top of her legs in an Indian-style fashion." Id. She sat upright momentarily, slumped to her left side and "Bauer stomped on her left ankle with his work boot. (He testified that he kicked her in the buttocks.)" Id. The defendants' expert witness, Dr. Pojunas, explained that a torquing motion probably caused Hagge's injuries. According to Judge Reynolds,
 
 
 12
 the break occurred as Margaret fell to the ground.... Bauer was both the actual and legal cause of the fracture. Bauer induced the torquing movement to Margaret's left leg by kicking her two inches below her left knee as she stood outside the back door of her home with both of her wrists handcuffed behind her back. She did not fall after a failed attempt to kick officer Schmidt.
 
 
 13
 Id.
 
 II
 
 14
 The district court issued nineteen pages of Findings and Conclusions to communicate the decision below. Although many of the facts are undisputed, the defendants-appellants (referred to as "Bauer") contend that certain findings of the court are clearly erroneous and should be set aside. Bauer argues that, given the implausibility of Mrs. Hagge's testimony, it was clearly erroneous for the court to conclude that a kick from Bauer caused Hagge's injuries. Bauer points to the numerous false allegations made by Mrs. Hagge; he suggests this renders her entire testimony incredible. And Bauer considers this crucial since Margaret's own testimony formed the sole basis for the court's conclusion that Bauer injured Mrs. Hagge.
 
 
 15
 Bauer contends Hagge's testimony was inconsistent and implausible. Bauer suggests it is significant that the district court invariably based its findings on the testimony of the police officers whenever there was a conflict between the testimony of the officers and of Hagge, with one exception--the court found that Bauer kicked Hagge.
 
 
 16
 Bauer cites the following inconsistencies as critical to Hagge's credibility. Hagge said she was handcuffed outside, but the court found that the officers handcuffed her in the kitchen. Hagge said there was nobody in the yard to witness the kick, but the court credited the observations of the officers to find that her legs flew into the air. Hagge testified that she fell to the ground after getting kicked, but the court found that her legs flew into the air. Bauer also argues that Mrs. Hagge changed her story of how the fractures occurred. Apparently, she reported to hospital personnel that she suffered the injuries when one of the police officers stomped on her leg.
 
 
 17
 Bauer also criticizes Hagge's description of other events of the night of the injuries. Hagge testified, for example, that only Bauer approached her after she had interfered with the officers' apprehension of Mr. Hagge, but the court found that Liegler was standing next to Bauer. Similarly, the court found that Bauer, Liegler and Schmidt were all present in the kitchen when Hagge was arrested, although Hagge claimed that Bauer never made it to the kitchen. Hagge also claimed that, while she was in the stairway, Bauer smashed her head against the wall three times. The court made no such finding. Bauer concludes that Hagge's testimony is against the great weight of the testimony of all the other witnesses and against the extrinsic objective evidence of the nature of her injuries. Dr. Pojunas explained that the injuries were caused by a twisting motion rather than a direct blow to the leg. Bauer insists Hagge's story of how Bauer delivered the kick is facially implausible.
 
 
 18
 This case was tried to the court. Under Fed.R.Civ.P. 52(a), in a trial without a jury, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." In a recent statement on the meaning of "clearly erroneous" the Supreme Court has said:
 
 
 19
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 20
 Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Bauer has launched an extensive attack on Mrs. Hagge's credibility. The Supreme Court has warned that such an attack rarely succeeds:
 
 
 21
 When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. See Wainwright v. Witt, 469 U.S. 412 [105 S.Ct. 844, 83 L.Ed.2d 841] (1985). This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. See, e.g., United States v. United States Gypsum Co., supra, 333 U.S. , at 396 [68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) ]. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.
 
 
 22
 Id. 470 U.S. at 575, 105 S.Ct. at 1513.
 
 
 23
 The findings issued by Judge Reynolds reveal a definite preference for one witness's testimony over that of others. The court found that Bauer "violently kicked" Mrs. Hagge and that the officers distorted their testimony and did not tell the truth. Findings at 6. But such a credibility choice does not immunize the findings from further scrutiny; absent documents or objective evidence to contradict Mrs. Hagge's version of events, we must consider whether "the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." Anderson, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 
 24
 Bauer's specific contentions concern the plausibility issue. Bauer argues that it is physically impossible for Hagge's legs to have been propelled forward into the air as a result of having been kicked on the front of her left leg. Thus, Bauer contends the finding that Hagge was kicked on the front of the leg must be set aside.
 
 III
 
 25
 Our review of the record indicates that we need further scrutinize only a few details of the district court's findings to determine if they are implausible. First, we must resolve, based on a searching view of the record, how a kick to the front of the leg caused a "torquing" injury as the expert doctor described. Second, we must resolve how, as the officers described, Hagge's legs could fly forward into the air after being kicked on the front of the leg. At first glance we might be inclined to dismiss these contentions as mere quibble, especially since they fail to cloud what is presently a "clear understanding of the ground or basis of the decision." Wattleton v. International Brotherhood of Boiler Makers, 686 F.2d 586, 591 (7th Cir.1982), cert. denied, 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 442 (1983). (Nobody disputes what operated as the basis for the decision below--Judge Reynolds believed Margaret Hagge when it counted most.) But the law requires a "plausible" story, and we must discover one in the findings of fact.
 
 
 26
 The court found that "Bauer was both the actual and legal cause of the fracture. Bauer induced the torquing movement to Margaret's left leg by kicking her two inches below her left knee as she stood outside the back door of her home with both of her wrists handcuffed behind her back." Findings at 7. Judge Reynolds also declared that he was "satisfied that the break occurred as Margaret fell to the ground." Id. Neither have the appellants argued the point, nor do we consider these statements to be inconsistent. They exist in harmony if construed to mark the time frame in which the fracture occurred. After Margaret Hagge hit the ground, her leg was fully broken. Judge Reynolds did not decide whether the fractures occurred at the instant of the kick or upon falling, but we think it is unimportant. As Hagge has argued, the court's finding was consistent with the medical testimony of Dr. Pojunas. In Hagge's view, the medical testimony "was all consistent with the torquing forces which Bauer induced as he spun away from Margaret as he was following through with his kick, and the torquing forces which existed when Margaret landed on the ground with her foot planted for a split second before her leg broke." Appellee Br. at 19.
 
 
 27
 This view is also found in Hagge's Proposed Findings of Fact and Conclusions of Law presented to the district court and made a part of the appellate record:
 
 
 28
 The court finds as a fact that Margaret Hagge broke her leg either during the instant just before her left leg flew into the air to follow the right leg in there [sic] trek toward Officer Schmidt's nose or that she broke her leg as she fell to the ground in the Indian-style posture and that the break may have occurred at the instant when her left foot touched the ground and her body continued to apply torque to the left leg.
 
 
 29
 Plaintiff's Proposed Findings at 16-17. These Findings were not adopted specifically, but they are a part of the record on appeal, see Fed.R.App.P. 10(a), and we consider them relevant to ascertaining the options available to the Judge at the time he decided the case.
 
 
 30
 It was Dr. Pojunas who explained how torquing forces might exist upon landing:
 
 
 31
 The injury occurs because the foot gets planted usually with the toes out to the side and in other words we term that an external rotation position for the foot. The foot gets planted out to the side, the patient falls in a twisting manner with the foot planted.
 
 
 32
 Transcript of Proceedings at 425-26.
 
 
 33
 To explain the rotational movement caused by a kick, the plaintiff procured the testimony of Nancy LeGant, an "expert in the field of gymnastics and dance." Transcript at 379. Much of her testimony was directed toward demonstrating how Margaret Hagge would be incapable of voluntarily kicking her legs five feet into the air while her hands were handcuffed behind her back, as the officers said she did. But LeGant also explained how a kick, perhaps a "judo" kick, might cause a torquing motion.
 
 
 34
 LeGant: And in this, the person, if I may use counsel here for a demonstration, the person whoever would have them by the arm and in whatever position could have caused in stepping forward a slight torsion with that person, had the body twist but the foot still remained the same, kicked in here, which would have caused the legs to be propelled into the air at what height is determined by whatever force and the body weight at the time. And then the person would have then collapsed to the floor.
 
 
 35
 Counsel: Ms. LeGant, as you have described this movement, I didn't move my left leg. Would that put a twisting force into my left leg if I don't move my foot?
 
 
 36
 LeGant: Right. It causes a torque. Whenever there's twisting action and the foot remains in the same position, a twist or torque action would be occurring at different joints, all the joints basically.
 
 
 37
 Transcript at 400-01.
 
 
 38
 The district court also found that Hagge's legs reached a height of five feet and five inches. Bauer uses this finding as a starting point to conclude that Hagge could not have been kicked on the front of the leg. "The laws of physics mandate and common sense dictates that if a person were kicked on the front of the leg, that leg would go backwards and the body would fall forward." Appellant Br. at 21.
 
 
 39
 Actually, this particular finding of the court has interesting history. The officers testified that Hagge's legs reached a height near to Officer Schmidt's nose. A major part of Ms. LeGant's testimony was directed toward showing that Hagge could not have projected her own legs to such a height, not voluntarily, not unless someone else thrust her legs. Therefore, on cross-examination, defense counsel attempted to show that Hagge could indeed kick her feet to a height of five feet, despite her poor flexibility, without the help of a third party. But nobody first disputed whether the officers were correct in testifying that Hagge's legs soared into the air. Mrs. Hagge did not recall her legs flying into the air but only that she slumped to the ground after being kicked. Nevertheless, Hagge's theory of the case accepted the flying legs phenomenon as fact and Judge Reynolds ultimately credited this aspect of the officers' testimony.
 
 
 40
 Again, the testimony from Ms. LeGant is the closest thing available to a description of how Hagge could get kicked on the front of the leg, have her legs soar upward and then fall to the ground with a severe leg injury.
 
 
 41
 Counsel: My description is I want you to assume that William Bauer was standing on Margaret Hagge's right side holding her right arm. As he kicks her two inches below the left knee, the force vector from the kick rather than being 90 degrees to her body is closer to 180 degrees, coming across her left knee.
 
 
 42
 LeGant: Okay. She would be more or less pulled in towards him this way, causing a little bit of torsion and a twisting this way and pulling, twisting in front of it. Because the action producing that way, every action has an equal and opposite reaction. If the force is going to go to the left, then it's going to correspond and the movement will be to the right.
 
 
 43
 Counsel: Would you expect in the situation I have just hypothecated that her legs would fly into the air?
 
 
 44
 LeGant: To the left.
 
 
 45
 Counsel: To the left. How would your answer be changed, if at all, if we assume that as Mr. Bauer is kicking Margaret Hagge below the left knee, he is spinning away from her while holding her arm for some moment?
 
 
 46
 LeGant: Okay. What happens is in holding the arm, he is causing a torque action, because he is twisting, dropping one shoulder which is automatically going to cause a turn to the action that's going to be in opposition. So if I would hold his arm right here and--.
 
 
 47
 Counsel: You hold my right arm as I hypothecated with Mr. Bauer.
 
 
 48
 LeGant: And I would kick this way. I would still have some pulling down here which would cause a twisting action. His legs would come around towards the front and he would fall in a twisted position to the side.
 
 
 49
 Transcript at 395-97. This "expert" testimony is not a model of clarity. One could act out the described events in Chambers if moved to do so, but we have discovered that it adds little to the black and white of the trial transcript. And we are aware of the limits of a review by transcript--we have not observed the witnesses testify. Only Judge Reynolds had such an opportunity.
 
 
 50
 Upon evaluating the disputed findings in the context of all the evidence presented, Hayden v. Oak Terrace Apartments, 808 F.2d 1269, 1271 (7th Cir.1987); Ratliff v. City of Milwaukee, 795 F.2d 612, 617 (7th Cir.1986), we are not left with a definite and firm conviction that the trial court made a mistake. Our method of review is an inexact science, of course, and perhaps the record provides only thin support for the court's findings, but we cannot say that the facts are either internally inconsistent or contradicted by extrinsic evidence (the Doctor's report).
 
 
 51
 In Hayden, the crucial witness's testimony was at times contradictory and confusing, but we considered it significant that the testimony was clear, and the trial judge chose to credit it, at two key points. 808 F.2d at 1272. Judge Reynolds made a similar choice in this case, despite the confusion in Mrs. Hagge's testimony. He chose to believe Mrs. Hagge as she described how her injuries were caused by Bauer's kick. When the trial court's decision to embrace one version of a story over another "falls well within the permissible bounds of choice," there can be no error in the factual determination. Landau & Cleary, Ltd. v. Hribar Trucking, Inc., 807 F.2d 91, 94 (7th Cir.1986). Judge Reynolds considered the officers' testimony to be suspect because it was thorough and consistent throughout, and yet, not one of the officers could recall whether Bauer kicked Mrs. Hagge as he admitted doing, or whether Bauer told her to "knock that shit off" as he admitted saying, although the officers were standing within a few feet of Bauer. The officers did not utter a single word prejudicial to Bauer's defense. Moreover, Judge Reynolds found it incredible that Mrs. Hagge could have kicked Bauer in the groin while she was seated on the ground in handcuffs and barefooted. We think the trial court's credibility determinations fall well within the permissible bounds of choice.
 
 
 52
 We also consider the record to be sufficient to refute Bauer's claim that the trial court's version of the facts describes a physical impossibility. Ms. LeGant, the expert witness, attempted to shed light on the kick and the various movements that probably occurred if Bauer in fact caused Mrs. Hagge's injuries. We need not scrutinize this testimony for scientific certainty. It is enough for us to conclude that Ms. LeGant's testimony is not at odds with what little we know about physical processes, and that her description, therefore, cannot be considered implausible. How Mrs. Hagge's legs could reach a height of five feet upon receiving a kick on the leg remains a mystery to us. But it is unimportant. "An error that would not (if corrected in time) have altered the judge's conclusion is a harmless error, and therefore not a ground for reversal." Kwasny v. United States, 823 F.2d 194, 196 (7th Cir.1987); Nord v. United States Steel Corp., 758 F.2d 1462, 1468 (11th Cir.1985). We should be reluctant to make factual findings on our own, Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986), and thus we venture no opinion on what we would have determined as the initial finder of fact. As we are cautioned:
 
 
 53
 To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging retrial of some factual issues, and needlessly reallocate judicial authority.
 
 
 54
 Fed.R.Civ.P. 52(a), Notes of Advisory Committee. We conclude that the findings are not clearly erroneous.
 
 IV
 
 55
 Bauer contends that this case must be remanded to the district court for remittitur or a new trial because the compensatory damages of $75,000 are excessive. He also contends that the punitive damages award of $25,000 exceeds what is required to serve the objectives of deterrence and punishment in light of his annual salary of $27,600, his limited assets and his considerable obligations to his wife and two small children. Bauer urges the Court to exercise greater scrutiny in review of the awards because the district court essentially adopted the plaintiff's findings on damages.
 
 
 56
 The district court engaged in a form of factfinding when it ascertained Hagge's damages and, therefore, the damage award cannot be set aside unless it is clearly erroneous. We have suggested that a proper approach in reviewing damages awarded from the bench might tend toward the more deferential "grossly excessive" standard used in jury cases, especially when reviewing damages awarded for intangibles like distress. See Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1425 (7th Cir.1986). In any event, what is significant is that we are inclined to recognize the considerable discretion entrusted to the district court in calculating damages, even in cases where the court has adopted the findings of the prevailing party. If the adopted findings are sufficient to permit appellate review and are not clearly erroneous, the appellate court must affirm the judgment. Walton v. United Consumers Club, Inc., 786 F.2d 303, 313-14 (7th Cir.1986).
 
 
 57
 Compensatory damages in Sec. 1983 cases are ordinarily determined according to the principles derived from the common law of torts. It is unquestioned that compensation includes out-of-pocket loss and other monetary harms, as well as personal humiliation, mental anguish and suffering. Memphis Community School District v. Stachura, 477 U.S. 299, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). However, our concern is actual, not imagined, damages; we have previously demonstrated our ability to reduce an award not supported with proof. See, e.g., Bailey v. Andrews, 811 F.2d 366 (7th Cir.1987); Taliferro v. Augle, 757 F.2d 157 (7th Cir.1985).
 
 
 58
 The district court awarded $75,000 in compensatory damages, $25,000 in punitive damages, and $6,457.78 in special damages to cover medical and insurance bills. In setting the awards, the court relied on the view of Dr. Pojunas that the fracture would heal very slowly, and on the various forms of evidence indicating that Mrs. Hagge "suffered considerable pain, anguish, loss of consortium, and inconvenience as a result of her broken leg." Findings at 11. A full-length leg cast burdened Mrs. Hagge for two months. She hobbled around with shorter casts for several more months and, ultimately, she used a bone stimulator machine for three months. Mr. Hagge testified about the pain his wife experienced and about the great difficulty with which she accomplished ordinary tasks like getting out of bed and using the toilet. Everything required assistance. She wrapped the bone machine around her leg twelve hours a day. At trial, Mrs. Hagge read into evidence excerpts from the diary she maintained to record her daily suffering, her pain, her emotional distress, and the inconvenience caused by her broken leg.
 
 
 59
 Lest we grope for objective standards of compensatory damages in thin air, comparability has developed as an element of damage award analysis. Bailey v. Andrews, 811 F.2d 366, 373 (7th Cir.1987) (citing Levka v. City of Chicago, 748 F.2d 421, 425 (7th Cir.1984); Phillips v. Hunter Trails Community Assoc., 685 F.2d 184, 190 (7th Cir.1982)); see also Hunter v. Allis-Chalmers Corp., 797 F.2d at 1425. But Bauer has offered nothing to demonstrate that $75,000 in compensatory damages is "out of line with a clear trend of awards at lesser amounts." Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1275 (7th Cir.1983). In fact, Mrs. Hagge argues that, when compared with jury verdicts in similar cases of leg fractures and emotional distress, the compensatory damages awarded in this case fall at the lower end of the scale. Although we are in no way bound by the source Mrs. Hagge uses to make such comparisons (something called "Personal Injury Valuation Handbooks"), Bauer makes no serious attempt to rebut the claim. In view of the substantial damages alleged by Mrs. Hagge, we conclude that it was not clearly erroneous for the district court to award $75,000 in compensatory damages.
 
 
 60
 We also affirm the district court's award of $25,000 in punitive damages. Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure. Tolliver v. Amici, 800 F.2d 149, 151 (7th Cir.1986); Hamilton v. Svatik, 779 F.2d 383, 389 (7th Cir.1985). "A[n] award of punitive damages should be set aside only if it exceeds what is required to serve the objective of deterrence and punishment." Hamilton, 779 F.2d at 389. We do not think the award in this case was excessive. It is not easy to determine what specific amount is required to deter and to punish, but because "[p]olice brutality is an exceedingly serious matter," Taliferro, 757 F.2d at 162, we conclude that $25,000 in punitive damages is not too much.
 
 V
 
 61
 Were this case merely an appeal of the trial judge's credibility determinations, it would certainly be a frivolous appeal as Hagge ultimately suggests. See District No. 8 v. Clearing, 807 F.2d 618, 622-23 (7th Cir.1986). We have construed Rule 38 of the Federal Rules of Appellate Procedure to authorize an award of reasonable attorney fees as a sanction for a frivolous appeal. See, e.g., Dreis & Krump Mfg. v. Int'l Ass'n of Machinists, 802 F.2d 247, 255 (7th Cir.1986). But, here, we do believe the appellants have raised an actual plausibility issue. The pertinent factual sequence, as found by the district court, is difficult to conceptualize. As we have said before, where the factual findings are incoherent or implausible they may be set aside as clearly erroneous. Surely this is not an easy determination. However, one can assume that the more certain the factual findings the less the need to contest them on appeal.
 
 
 62
 It is a truism that "the great number of ill-advised appeals claiming that the factfindings were erroneous threatens the viability of the entire system." Gilbert v. Scratch'N Smell, Inc., 756 F.2d 320, 321 (4th Cir.1985). But it is equally clear, we think, that the loser at trial should retain the right to dispute on appeal the constellation of factual findings which defy ready identification--alternately appearing clearly erroneous through one lens, yet plausible and reasonable through the other. Sanctions are reserved for abusive conduct. For this reason, Bauer's appeal was not frivolous, and we deny Mrs. Hagge's motion for an award of double attorney fees under Rule 38.
 
 
 63
 The judgment of the district court in 86-1469 is AFFIRMED.
 
 No. 86-2974
 
 64
 Just one week after we heard oral argument on the merits in No. 86-1469, the district court fixed the amount of attorney fees that it had awarded in its initial decision on the merits. (A later determination of attorney fees does not deprive the initial judgment of finality. Barrington Press, Inc. v. Morey, 816 F.2d 341, 342 (7th Cir.1987).) Bauer then appealed from the district court's determination of fees, and we ordered the appeals consolidated for decision.
 
 
 65
 Judge Reynolds awarded Hagge $43,948.31 as reasonable attorney fees and costs incurred in successfully litigating this civil rights case. The court found that the award was appropriate under either a straight contingency fee analysis or a lodestar analysis with an upward adjustment. Counsel for Hagge had a contingency fee of 40 per cent (55 per cent for defending an appeal).
 
 
 66
 Having had a $106,451.78 judgment ($107,662 when taxable costs are thrown in) entered in her favor, Mrs. Hagge is certainly entitled to an award of attorney fees as a prevailing party under Sec. 1988. But Bauer contends that the court awarded an unreasonably high fee. Bauer first argued that the district court erred in using the contingent fee agreement as a factor for calculating a fee award under Sec. 1988. However, Bauer abandoned this argument after a closer reading of our decisions in Kirchoff v. Flynn, 786 F.2d 320 (7th Cir.1986), and Lenard v. Argento, 808 F.2d 1242 (7th Cir.1987), and we think that was a wise decision. Bauer persisted in appealing the district court's fee award on two grounds: first, that it was error to use a straight contingent fee analysis without first computing a lodestar figure, and second, that the court relied on improper factors in awarding an upward adjustment from the lodestar figure.
 
 
 67
 Addressing first the latter of the two arguments, we agree with Bauer that the court made an improper upward adjustment of the lodestar figure. The court gauged the lodestar fee (total hours multiplied by hourly rate) to be $30,940. It then ordered an upward adjustment to "at least the market rate for similar cases." The court considered the adjustment warranted because Hagge's attorneys "did an excellent job;" they obtained the entire relief sought; they bore the burden of persuasion on the witness credibility issues; and given the contingency of their fee, they bore the risk of not winning. Bearing the risk of loss, however, is not accepted in this Circuit as the basis for adjusting upward a lodestar figure because it would be an incentive to pursue unmeritorious litigation. McKinnon v. City of Berwyn, 750 F.2d 1383, 1392 (7th Cir.1984) (The Supreme Court has yet to decide the question. Pennsylvania v. Delaware Valley Citizens' Council, --- U.S. ----, 106 S.Ct. 3088, 3100, 92 L.Ed.2d 439 (1986).) Moreover, as the Supreme Court recently stressed, the complexity of the issues, the skill and experience of counsel, the quality of representation, and the results obtained from the litigation "are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award." Delaware Valley Citizens' Council, 106 S.Ct. at 3098.
 
 
 68
 Nonetheless, Bauer cannot prevail on the basis of just one successful skirmish. It is clear from our review of the district court's decision that it intended alternative holdings: "The plaintiff will be awarded $43,948.31 in attorney's fees and costs. That amount is appropriate under either a straight contingency fee analysis or using a lodestar analysis with an upward adjustment." Order at 6. We affirm this decision because we do not think the district court has abused its discretion.
 
 
 69
 If we were to read the district court's "straight contingency fee analysis" to suggest that the contingency rate is per se reasonable, we would reverse because of the Supreme Court's emphasis on lodestar amounts in City of Riverside v. Rivera, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). But a full reading of the district court's decision informs us that the court merely found that, in this case, the contingency rate reflected a "reasonable" attorney fee. Our latest decisions have advanced the notion that the contingent fee arrangement should carry considerable evidentiary significance in ascertaining a reasonable fee award. Lenard v. Argento, 808 F.2d 1242, 1248 (7th Cir.1987); Kirchoff v. Flynn, 786 F.2d 320, 328 (7th Cir.1986). Moreover, what is reasonable is "the market rate for the services reasonably required to produce that victory," Kirchoff, 786 F.2d at 328; see also Blum v. Stenson, 465 U.S. 886, 893, 104 S.Ct. 1541, 1546, 79 L.Ed.2d 891 (1984), and if the standard means of compensation for such services is the contingent fee, "then the contingent fee is the market rate." Kirchoff, 86 F.2d at 324. Such an approach works best in a case like this one, "where the civil rights suit involves substantial stakes, settled precedent, and no defense of immunity." Lenard, 808 F.2d at 1248.
 
 
 70
 We suggest that, whatever hostility the decision in Rivera expresses about using contingency fee measures in Sec. 1988 fee awards, it is a hostility directed toward contingency fee amounts which would not meet the lodestar figure. Rivera emphasized the fact that Congress was concerned about the lack of incentives for lawyers to bring civil rights suits that would yield little pecuniary recovery in relation to the lawyer hours expended. Rivera, 106 S.Ct. at 2686. That is clearly not the scenario here, where all the requested relief is pecuniary. In sum, the district court did not abuse its discretion in using the contingency rate as a reasonable fee.
 
 
 71
 AFFIRMED.
 
 
 
 *
 Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation