Charles Brooks TALIFERRO,
Plaintiff-Appellee,

v.

William AUGLE and Kenneth Hoffman,
Defendants-Appellants.

No. 84–1209.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1984.
Decided March 13, 1985.

158

Philip Bronstein, Corp. Counsel, Chicago, Ill., for defendants-appellants.

Thomas D. Rosenwein, Karon, Morrison & Savikas, Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

Taliferro brought this suit for damages under 42 U.S.C. § 1983 against two Chicago police officers, Augle and Hoffman, alleging that they had stopped him on the street without reason to believe he was engaged in criminal activity, had arrested him without probable cause, had beaten him, and had failed to preserve his property, all in violation of his rights under the Fourteenth Amendment. The jury found that the officers had had a reasonable basis for stopping him, but upheld the other charges in the complaint and awarded Taliferro $47,000 in compensatory damages and $25,000 in punitive damages ($12,500 against each defendant), for a total of $72,-000. The defendants appeal, arguing that the judge should have granted their motion for a new trial because the verdict was against the weight of the evidence, or at least should have cut down the damage award as excessive.

Taliferro is black, a working man, and also a writer on the theme of oppression of

blacks by whites. At the time of the arrest he was 46 years old. He testified as follows: On the night of the arrest he was crossing a street in downtown Chicago, carrying an attache case and two shopping bags containing miscellaneous personal belongings including several manuscripts, when officers Augle and Hoffman, who are white, accosted him, grabbed him, handcuffed him roughly, and, soon joined by other policemen, beat him. After trundling Taliferro off to the police station with the help of the other officers, Augle and Hoffman again beat him (as did other officers, separately, in an elevator), inflicting serious injuries that included destroying his dental plate and knocking out many of his real teeth. His property was taken from him at the police station; he was never told how he could get it back; and it was destroyed as abandoned property a few weeks later. Augle and Hoffman had on a previous occasion stopped Taliferro and asked for identification; and Taliferro had once seen Augle at a Nazi rally wearing a Nazi-like uniform and sporting a Hitler mustache.

Taliferro was charged with assault and battery against the police officers. After spending several days in jail, he was bailed out by his friend, Mrs. Richardson. She testified that when she picked him up "he looked bad. I had never seen him look like that. His face was all swollen, his mouth. He just looked like he had been really ruffled up and his clothes. He looked bad. No doubt about it, he had been beaten up." The present status of the criminal charges against Taliferro is unclear. He pleaded guilty but the plea was vacated on appeal and the matter set for trial, but when he did not appear for the trial a bench warrant for his arrest was issued but apparently it has never been executed.

If all of Taliferro's testimony had been believed, the jury would have been on solid ground in finding that the defendants had violated his federal civil rights. But the jury's finding that the defendants had had reasonable grounds for stopping Taliferro shows that it did not believe all his testimony—did not believe that the police had just grabbed him without provocation while he was crossing the street. The jury must have believed the defendants' testimony about the beginning of the confrontation. The defendants testified that they saw Taliferro standing in the vestibule of a store long after the store had closed, holding his attache case, with several shopping bags on the ground next to him. The defendants thought he might be up to no good— especially since they had been instructed to be on the alert for possible terrorist activity that night by the FALN, a Puerto Rican terrorist group. After Taliferro cursed the defendants and refused to tell them what he was doing in the vestibule at that hour, the defendants approached him. He swung at them with his attache case. They radioed for assistance, and the group of officers that gathered in response to their call had to use force to subdue Taliferro and put him into the paddy wagon. The defendants denied using excessive force either at the arrest or later, or that they had destroyed his property, or had accosted him previously; and Augle denied having attended a Nazi rally.

Taliferro's testimony lacked credibility in other respects besides the circumstances of the arrest. His unsubstantiated testimony that he had seen Augle at a Nazi rally, wearing a Nazi-style uniform and Hitler mustache, was bizarre, and his testimony that these two officers had stopped him previously was refuted by unrebutted evidence that one of them had been off duty at the time. Taliferro's testimony that he was seriously beaten is hard to square with the fact that he waited several days after his release from jail before going to a doctor and that the doctor's report noted only minor bruises on the ribs and lacerations on the wrists—injuries entirely consistent with Taliferro's having resisted arrest—and made no mention of the condition of his mouth or of any bruises on his face.

Taliferro did put 11 teeth and a fragment of dental plate into evidence at the trial. He said the teeth had been loosened by the beating and had fallen out later. But he presented no (other) dental evidence, and though the doctor testified at the trial he added nothing to what was in his report. He didn't remember examining Taliferro's mouth; and although this is consistent with the superficial character of the rest of the examination, and with the tiny fee for it ($15), it is hard to believe that if Taliferro had just lost 11 teeth because of a beating he would not have mentioned the condition of his mouth to the doctor and the doctor would not have noticed it as soon as Taliferro opened his mouth (as in the gap-toothed photograph noted below) to speak. Taliferro's testimony that the teeth had merely been loosened in the beating and had fallen out later, while consistent with the doctor's failure to notice anything wrong with Taliferro's mouth, is inconsistent with his testimony that the gap-toothed photograph showed him as he appeared when he left the police station.

Apart from being billed $15 for each of two visits to the doctor, Taliferro incurred no medical expense except $5 for an anti-inflammatory drug that the doctor prescribed. A photograph of Taliferro, gap-toothed and really quite frightening, purporting to depict him after the beating, bears little resemblance to the police photograph of him taken after he was arrested but before he was released—a photograph in which he appears to be completely normal—even though the scary picture must have been taken after the police photo. The militantly anti-police tenor of Taliferro's writings makes it at least plausible that he may have resisted arrest violently; and Augle's and Hoffman's supervisor, who appeared at the scene of the arrest before Taliferro was put into the paddy wagon (and who happens to be black), testified that there were no signs of excessive force. Although Taliferro testified that he bled profusely, his clothes, which were introduced into evidence, show only slight traces of anything that might (though equally might not) be blood. It comes as no surprise that the district judge remarked, "I know the court buffs were surprised by the verdict. . . . But that's what juries are there for" (prompting the following rather impertinent question from one of the lawyers for the defendants: "To surprise court buffs?"). The judge also described Taliferro's testimony about the Nazi incident as "fanciful." Nevertheless he refused to grant the defendants' motion for a new trial.

If our function in reviewing the denial of a motion for a new trial were to read the transcript and study the exhibits and then decide as an original matter whether we thought the jury's verdict had been against the clear weight of the evidence, we might order a new trial. Much of Taliferro's testimony was false, and this undermines our confidence in his remaining testimony. His only corroboration was from his friend Mrs. Richardson, whose testimony about his appearance seems belied by the police photograph. The teeth prove nothing without dental evidence. They could have fallen out at any time before the trial, and for reasons wholly unrelated to the beating—assuming they are Taliferro's teeth; assuming, indeed, they are human teeth. Certainly if the district judge had granted a new trial, his order could not be set aside.

But it is not our role to play district judge and decide whether we would have decided the motion for a new trial as he did. We cannot put ourselves in his shoes; we did not see the witnesses testifying, or the jurors listening to the testimony. Maybe if we had been there we would have disbelieved most of the testimony of most of the witnesses yet have concluded that the core of Taliferro's testimony—that the two defendants had beaten him, though not so severely as he claimed, and had effectively destroyed his property by not telling him how to reclaim it before it was

destroyed under the police department's regulations—was probably true. As we cannot say from the evidence in the appellate record that the jury would have been unreasonable to evaluate the testimony as we have just suggested it may have done, we cannot call the judge unreasonable in refusing to grant the defendants a new trial; and we certainly cannot say that he was "inescapably wrong," which is the test for reversing such a refusal. 9 Moore's Federal Practice ¶ 110.08[3], at p. 124 (2d ed. 1983). Perhaps the judge would have been unreasonable if this case had pitted an immensely popular plaintiff against despised and disreputable defendants. But the opposite would be closer to the truth. Police officers are popular defendants; black militants living on the margins of the society are not.

 So we do not think the judge was required to grant a new trial. But we do think he was required to cut down the award of compensatory damages. The issue here is not the credibility of any of the witnesses, a matter on which the scope of appellate review is necessarily highly limited, cf. Fed.R.Civ.P. 52(a); it is whether the plaintiff put in enough evidence to justify the jury's award of damages, even assuming that all of that evidence was credible. Even here, the scope of appellate review is quite limited; we can reverse only if we think the jury's award of damages was greatly disproportionate to the evidence of injury. See, e.g., *Levka v. City of Chicago*, 748 F.2d 421, 424–25 (7th Cir.1984). But we are not so confined as we would be if the award rested on a determination of the credibility of witnesses.

Taliferro presented no evidence regarding the extent of his injuries except what might have been inferred from his and Mrs. Richardson's testimony, the ghastly photograph of unknown date, and the scanty medical evidence. The complaint had asked for compensatory damages of at least $381,000, but in closing argument Taliferro's counsel scaled this down to "in excess of" $25,000 for physical injury, $100,000 for emotional distress, and $50,000 for lost property, mainly destroyed manuscripts. · Although there was some testimony that Taliferro lost his job as an oblique consequence of the arrest, no evidence of lost earnings was put before the jury.

All the numbers we have quoted are grossly excessive in relation to the evidence. Although at argument in this court Taliferro's counsel stated that Taliferro had required elaborate dental reconstruction, no bills for dental work were put into evidence, and the only evidence of treatment other than that for which he paid a total of $35 was Taliferro's improbable testimony that as a result of the beating he had to be fitted with eyeglasses for the first time, together with a bill for the glasses and for the examination of his eyes.

 As for the loss of the manuscripts, the author of this opinion, as a sometime author of academic manuscripts, can feel keen sympathy with any author who loses a manuscript of which he has not made a copy; and Taliferro had no copies. Although his loss was not a financial one, since he derived less than $400 in annual income from all his writing and made no attempt to attach a dollar value to the manuscripts that were destroyed, an author may prove nonmarket damages for the tortious destruction of a manuscript. See, e.g., *Seth v. British Overseas Airways Corp.*, 329 F.2d 302, 305–06 (1st Cir.1964); *Newman v. Clayton F. Summy Co.*, 133 F.2d 465, 466 (2d Cir.1942) (Frank, J.); *Traveltown, Inc. v. Gerhardt Investment Group*, 586 F.Supp. 256 (N.D.N.Y.1984) (dictum), and cases cited there; Restatement, Second, Torts § 911, comment e (1979); see also Dobbs, Handbook on the Law of Remedies 398–99 (1973). True, these are not civil-rights cases. But federal tort statutes such as 42 U.S.C. § 1983 are not self-contained. They are enacted against a background of common law tort

principles governing causation and damages. See, e.g., *Parrett v. City of Connersville*, 737 F.2d 690, 695 (7th Cir.1984); *Keyes v. Lauga*, 635 F.2d 330, 336 (5th Cir.1981); cf. 42 U.S.C. § 1988. Those principles are therefore applicable to federal civil-rights tort cases unless unsuitable to them, cf. *Carey v. Piphus*, 435 U.S. 247, 257–59, 98 S.Ct. 1042, 1049–50, 55 L.Ed.2d 252 (1978)—and they are not unsuitable here. But the cases dealing with tortious destruction of a manuscript require proof of the value of the manuscript—for example, proof of the cost in time or materials of reconstructing it (the value of the manuscript could not exceed that cost). No proof concerning the value of the manuscripts to Taliferro was presented. His lawyer pulled the figure of $50,000 out of his hat at closing argument.

■■■■ The other figures are equally fanciful. We have criticized the casual attitude of many tort plaintiffs toward proof of damages, see *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 972–74 (7th Cir.1983), and like other courts have set aside excessive awards of compensatory damages in cases factually quite like this one. See, e.g., *Levka v. City of Chicago, supra*, 748 F.2d at 424–27; *Wheatley v. Ford*, 679 F.2d 1037, 1039–40 (2d Cir.1982); *Keyes v. Lauga, supra*, 635 F.2d at 336; cf. *Phillips v. Hunter Trails Community Ass'n*, 685 F.2d 184, 190–91 (7th Cir.1982); but see *Clark v. Beville*, 730 F.2d 739, 741 (11th Cir.1984). A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them. The only effort at proof here, besides the proof of $35 in out-of-pocket medical expenses, was Taliferro's testimony that he was distraught and humiliated by his mistreatment at the hands of the police, as well as suffering physical pain. Although it is a painful experience to be manhandled by the police and to have them take away and destroy personal belongings that have at the least a sentimental value, $47,000 is not a reasonable estimate of

such an intangible loss when no effort at all is made to establish an objective basis for quantifying the loss. We consider $25,-000 the highest compensatory damages that can be justified on this record, so unless Taliferro agrees to remit the difference between this amount and the $47,000 that the jury awarded as compensatory damages we shall order a new trial limited to damages. Although a $60,000 award was upheld in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1275–76 (7th Cir. 1983), a strip-search case, the facts were grotesque: "she was strip searched in front of a camera and in the presence of two male police officers and a group of jeering prostitutes." *Levka v. City of Chicago, supra*, 748 F.2d at 426. There is nothing like that here, a routine if regrettable case of excessive force; $25,000 is generous by comparison to the much lower awards given by district judges in similar cases. See *Adams v. Thompson*, 557 F.Supp. 405, 411–12 (M.D.La.1983); *Schiller v. Strangis*, 540 F.Supp. 605, 621 (D.Mass.1982); *Ellis v. Zieger*, 449 F.Supp. 24, 26–27 (E.D.Wis.1978).

■■■■ We shall not disturb the award of $25,000 in punitive damages, split between the two officers. Police brutality is an exceedingly serious matter and $12,500 is not excessive punishment of a policeman who commits it. It is true that a $15,000 award in a rather similar case was cut down to a maximum of $6,000 in *McKinley v. Trattles*, 732 F.2d 1320, 1327–28 (7th Cir.1984), a prisoner mistreatment case, but it was a less serious case. No compensatory damages had been awarded, indicating that the incident had been a minor one. And the district judge had indicated that he thought $15,000 excessive, so we were agreeing with him—not reversing a district judge's refusal to disturb the jury's award.

■■■■ General damages are not available in civil-rights tort cases, see *Freeman v. Franzen*, 695 F.2d 485, 493 (7th Cir.1982), and in any event were not sought here.

The judgment is affirmed conditional on the plaintiff's accepting a remittitur of $22,000. If the plaintiff refuses to accept the remittitur, the district court shall direct a new trial limited to compensatory damages. See *Abernathy v. Superior Hardwoods, Inc., supra,* 704 F.2d at 974. No costs in this court.

So Ordered.