Fred C. SANDERS, Plaintiff,

v.

CITY OF INDIANAPOLIS,
et al., Defendants.

No. IP 89–480–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 24, 1992.

Douglass R. Shortridge, Indianapolis, IN, for plaintiff.

John C. Ruckelshaus, Ruckelshaus, Roland Hasbrook & O'Connor and Joseph M. Perkins, Asst. Corp. Counsel, City–County Legal Div., Indianapolis, IN, for defendants.

## ENTRY

BARKER, District Judge.

On November 23, 1992, the jury returned a verdict in favor of the plaintiff, Fred C. Sanders, and awarded him damages in the total amount of 1.5 million dollars. The jury found that officers of the Indianapolis Police Department violated Sanders' civil rights in connection with an altercation that occurred at his home at 2961 Arthington Avenue in Indianapolis on August 14, 1988, by using excessive force, by failing to prevent fellow officers from using excessive force, and by conspiring to cover up evidence of wrongdoing. The defendants moved for a judgment as a matter of law at the close of the plaintiff's evidence as to all defendants on all counts (and renewed that motion at all proper times)[1] and have filed post-trial motions asking the Court to reconsider that verdict. For reasons that will be explained below, the

---

1. The Court took the motion under advisement.

Court grants the defendants' motion for a judgment as a matter of law as it pertains to: (1) the claim that Officer Ward used excessive force at and/or immediately inside Sanders' front door prior to the shooting, (2) the "code of silence"/conspiracy claim, and (3) the supervisory "failure to intervene" claim. The Court also grants the defendants' request for a "remittitur or new trial" on the remaining claims, and, accordingly, offers the plaintiff the option either of accepting a reduction in damages or a new trial.

## I. Motion for Judgment as a Matter of Law

When a timely motion for judgment as a matter of law (formerly referred to as a "JNOV") is filed pursuant to Fed.R.Civ.P. 50, a district court must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party to whom the motion is directed." *Cygnar v. Chicago*, 865 F.2d 827, 834 (7th Cir. 1989); *accord Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir.1985); *see Smith v. J.C. Penney Co.*, 261 F.2d 218, 219 (7th Cir.1958). In applying this standard, a district court is not free to weigh the evidence, to pass on the credibility of witnesses, or to substitute its judgment of the facts. *Rakovich v. Wade*, 850 F.2d 1180, 1188 (7th Cir.) (*en banc*), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2524, at 543–44 (1971); *see Cygnar v. Chicago*, 865 F.2d at 834. "If the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict, without speculation over legally unfounded claims, the motion should be denied." *Cygnar v. Chicago*, 865 F.2d at 835 (citing *Anderson v. Gutschenritter*, 836 F.2d 346, 348 (7th Cir.1988)).

### 1. Judgment Against Defendant Officer Ward

The jury returned a verdict against Officer Robert Ward (in the amount of $50,-000) for using excessive force against Fred C. Sanders at and/or immediately inside Sanders' front door (prior to the shooting).

However, the evidence presented at trial concerning Officer Ward's actions at and/or immediately inside Sanders' front door, viewed in the light most favorable to Sanders, does not support such a verdict. While there was evidence to support the jury verdict that Officer Ward used excessive force after the shooting, while Sanders lay handcuffed on his front lawn, the uncontested evidence concerning defendant Officer Ward's actions at the front door of Sanders' home prior to the shooting, was that Officer Ward assisted Officers Faber and Fender and Sergeant Knapp in their efforts to "push the door open." When the door did not open, Officer Ward, either on his own initiative or at Sergeant Knapp's urging, left the front door and circled around to Sanders' back-door. Sanders presented no evidence that Officer Ward struck Sanders or sprayed him with C.S. gas at or immediately inside Sanders' front door.

No reasonable jury could find that Officer Ward's actions in merely pushing on, but not moving, a door were excessive, especially when it is uncontroverted that the person behind the door, according to the information provided by his fellow officers, was committing the crime of resisting arrest. Further, Sanders presented no evidence that he was injured as a result of Officer Ward's actions in pushing on Sanders' door. There is not, therefore, as a matter of law, a sufficient probative basis upon which a jury could reasonably reach a verdict against Officer Ward with regard to the allegations that he used excessive force at and/or immediately inside Sanders' front door. Accordingly, the Court grants the motion for judgment as a matter of law as to Officer Ward's conduct at or immediately inside Sanders' front door, and that portion of the verdict against Officer ward is vacated.

### 2. Judgments Against the Conspiracy Defendants (Knapp, Coleman, Upton, Sickles, Ward, and Fender)

The jury returned verdicts against six police officers, defendants Sergeants Knapp, Coleman, Upton, and Sickles, and defendants Officers Ward and Fender, concluding that they had each conspired with one another to conceal evidence, thereby denying Sanders'

First Amendment "right-of-access" to the courts. Those verdicts cannot stand because Sanders failed to present any evidence to support his conspiracy theory.

Sanders "code of silence"/conspiracy claim was that the named defendant police officers:

were all present during the beating of Sanders after he surrendered while on the ground ... and all joined the conspiracy to conceal facts and the identities of the actual persons involved in the beating.

3. The purpose of the conspiracy was to conceal and cover up the true facts with regard to the illegal entry and the use of excessive force, and conceal the identities of the persons who participated in the beating of Sanders. Thus, the real purpose of the conspiracy was to deny Sanders free access to the court system. . . .

The jury was instructed that:

A conspiracy exists when two or more people reach an understanding to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means. So, a conspiracy is a kind of partnership, in which each member becomes the agent of every other member. The essence of a conspiracy is a combination or agreement to violate or to disregard the law.

Mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and may have discussed some common aims and interests is not necessarily proof of the existence of a conspiracy.

However, the evidence in the case need not show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished. In order to establish that a conspiracy existed, the plaintiff must show that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

\* \* \* \* \* \*

One may become a member of a conspiracy without full knowledge of all the details of the conspiracy. On the other hand, a person who has no knowledge of a conspiracy but who happens to act in a way which furthers some object or purpose of the conspiracy does not thereby become a conspirator.

The key element in Sanders' cover-up claim is that officers of the Indianapolis Police Department conspired to hide or withhold from Sanders evidence of what happened on August 14, 1988, and as a result, Sanders could not bring his civil rights claim and was denied access to the courts. However, Sanders failed to put forth any evidence to establish that between August 14, 1988 and the time of trial, any conspirator defendant hid, concealed, or withheld evidence concerning the events of August 14, 1988. Sanders presented no evidence of non-responsive affidavits, interrogatories, or depositions from the defendants; moreover, he presented no evidence that the defendants fabricated or concealed facts concerning the events in question *prior to trial*. Cf. *Bell v. Milwaukee*, 746 F.2d 1205 (7th Cir.1984). Further, because non-police officers (as well as Sanders) were present on August 14, 1988 who would have witnessed the police officers' use of excessive force, Sanders was not dependent on the defendant police officers to inform him of what happened in order to bring his claims for redress. *See id.* at 1262 ("The facts surrounding the killing were in the sole province of members of the Milwaukee police department."). The defendants did, indeed, have a legal obligation not to deny Sanders meaningful *access* to the courts, but they had no legal duty to assist Sanders in preparing or presenting his case.

 Essentially, Sanders' evidence was limited to a showing that the conspirator defendants, when on the witness stand, neither saw, spoke, nor heard any "evil." As such, Sanders' "code of silence" claim was simply that the police officers conspired to commit perjury, and therein lies its flaw, because a witness' false or misleading sworn

testimony cannot form the basis for § 1983 liability. *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *House v. Belford,* 956 F.2d 711 (7th Cir.1992). Repeating for purposes of insuring complete clarity, the only evidence presented by the plaintiff of a "code of silence" conspiracy was that the defendants withheld truthful testimony on the witness stand, and that withholding is not, as a matter of law, actionable as a § 1983 denial of access claim. This claim must therefore be vacated.

■ A second "missing link" in Sanders' conspiracy evidence is the critical element of agreement between two or more of the conspiracy defendants to conceal evidence. Though Sanders called an expert witness (William B. Head) who testified as to the theoretical existence of a "code of silence" in some police departments, Sanders presented no evidence of a "code of silence" in the Indianapolis Police Department; Professor Head explicitly testified that he had no knowledge of such a code within the Indianapolis Police Department. Moreover, Sanders failed to put forth any evidence that any co-conspirator defendant entered into any kind of agreement, tacit or otherwise, with another co-conspirator defendant concerning the concealment of evidence regarding an officer [2] exerting excessive force on Sanders. As Sanders called Sergeants Knapp, Upton, Sickles, and Coleman, and Officers Ward and Fender, each testified that he was present at Sanders house at some point on August 14, 1988, but did not see anyone (including Officers Ward or Fender) use excessive force against Sanders while Sanders was on his porch or front lawn. As to these points, Sanders failed to present any discrediting or rebuttal evidence.

Sanders' conspiracy claim had no evidentiary basis whatsoever. He required the jury to speculate that, because the defendant police officers were present at Sanders' house on August 14, 1988, they "must" have seen something, and since they are police officers and "must" have seen something, they "must" have conspired to conceal what they saw. Such speculation, however, is not evidence, and because a verdict based only on speculation cannot stand as a matter of law, these conspiracy verdicts must be set aside.

The untenable nature of Sanders' theory with regard to his conspiracy claim—that testimonial silence is tantamount to a "code of silence"—is obvious. A verdict based on the assumption that police officers, on every occasion, conspire to conceal evidence is akin to the conclusion that all mechanics, when they have the opportunity, assess overcharges for unnecessary repairs; that all politicians, when the public's back is turned, accept bribes; and that all taxpayers, when they think they can get anyway with it, cheat on their taxes—and no one ever tells. In a court of law, however, justice is dispensed based on evidence of articulated and proven facts, not on generalized assumptions and prejudices. This Court would no more permit a conviction for tax evasion based on speculation and opportunity to stand, than it would allow what appears to be a verdict born of nothing more than prejudicial assumptions against the alleged co-conspirator defendants in this case to stand. Even if the evidence permitted an inference that two or more of the conspiracy defendants did see someone besides Officers Ward or Fender use excessive force against Sanders, that evidence, considered in the light most favorable to Sanders, would at most have established that the observing defendants decided independently not to disclose their observation. Because one cannot conspire with oneself, the absence of evidence of a conspiratorial agreement renders the conspiracy verdict defective as a matter of law. *See Sledd v. Lindsay,* 780 F.Supp. 554, 559 (N.D.Ill.1991) (where plaintiff provided vague and conclusory allegations of a police "code of silence," court dismissed claim for failing to allege facts showing a " 'meeting of the minds' of

2. Sanders' denial of access claim is premised on the theory that, in addition to Officers Ward and Fender, certain other "unknown officers" applied excessive force against him after he exited his house. Sanders claims that because he does not know who those unknown officers were, he cannot file a claim for redress against them, and therefore, his right of access has been denied. His claim cannot be, therefore, that the conspirator defendants denied his right of access by not testifying about Officers Ward and Fender applying excessive force.

two or more defendants to engage in an unconstitutional action").

Simply put, there was not evidence, direct or circumstantial, sufficient to support a reasonable inference of any unlawful agreement, nevermind unlawful agreement to deny Sanders' right of access to the courts. Since the verdict is not supported by the evidence presented at trial, the motion for judgment as a matter of law as to the conspirator defendants must be granted.

### 3. Judgments Against Sergeants Knapp, Coleman, Sickles, and Upton

■ As was true with the above discussed "code of silence" theory, Sanders did not present any evidence that Sergeants Knapp, Coleman, Sickles, or Upton saw anyone (including Ward or Fender) exert or apply excessive force against him. As the Court instructed the jury, to prevail on this claim, Sanders had to prove that: (1) a defendant knew that a fellow officer was inflicting excessive or unreasonable force upon the plaintiff and (2) the supervising defendant had both the time and the present ability to intervene and prevent further harm to the plaintiff.[3] Sanders presented no evidence as to either element as to any of these defendants. According to the Court's review of the trial evidence, each of these sergeants testified that he did not see anyone (including Officers Ward or Fender) utilize excessive force against Sanders.[4]

Sanders failed to present evidence sufficient to support his claim that any of these supervising officers had the ability to prevent a fellow officer's use of excessive force. No evidence—from police officers, from non-police officers, from the media, or from Sanders himself—rebutted the testimony of these supervisory officers. Whether Officers Ward or Fender or some other officer actually exerted excessive force again, is not the issue here; the relevant inquiry is whether the supervisory officers *saw* a fellow officer apply excessive force and whether, when they saw it, they had the *ability to stop* the use of that force and *failed* to do so.

In the absence of evidence of any wrongdoing, or even of negligent behavior, on the part of the supervisory defendants, it appears clear that the jury based its determination of their liability simply on the fact that they were supervising officers. However, "[t]he common law does not hold a superior strictly liable for the torts of the employees he supervises, so it is no surprise that supervisor strict liability is rejected in section 1983 cases." *McKinnon v. Berwyn*, 750 F.2d 1383, 1390 (7th Cir.1984); *see Monell v. Dep't*

---

**3.** Sanders was also required to prove that a defendant was acting under color of law, statute, ordinance, regulation, or custom of the state of Indiana at the time of the incident, an element never in dispute in this trial.

**4.** Sergeant Knapp testified that when he approached the surrendering Sanders, Sanders shoved him into a bush. Sergeant Knapp testified that he watched as several other officers got Sanders on the ground and placed handcuffs on him (Knapp said that it was like a football game and he could not tell what was happening). Once he saw that Sanders was secure, he turned and focused his attention on Officer Faber; he watched as medics attended to Officer Faber's wounds.

Sergeant Upton testified that when he arrived at Sanders' house at 9:46 or 9:47 p.m., there already was an ambulance in the middle of the street. Upton said he never went into Sanders' yard, but he saw 10 to 15 officers in the "vicinity," the closest of which was 10 to 15 feet away from where Sanders was lying on the ground. Rather than investigate or watch what was happening in Sanders' yard, Upton, with Sergeant Coleman, took the responsibility of securing the area and placing crime-scene tape around the street. Upton testified that he only once looked away from the crowd, but did not see anyone strike or kick Sanders. Upton was on the scene for a total of ten minutes or less.

Sergeant Coleman testified that when he arrived at Sanders' house—he was not responding as a supervisor—he recognized Sanders and Officer Faber on the ground and saw fellow officers encouraging Officer Faber. Coleman was approximately four feet away from Sanders and did not see anyone kick or strike him. Coleman then left the yard and assisted Sergeant Upton in putting up crime-scene tape. While he was putting up the tape, medics arrived and started attending to Sanders' injuries.

Sergeant Sickles testified that when he arrived at Sanders' house, Sanders was already handcuffed and receiving medical attention. Sickles stated that he focused on whether Officer Faber was being attended to and tried to determine who witnessed the event. He talked to Sergeant Knapp and generally gathered investigative information. He stated that he did not see any officer hit or kick Sanders.

*of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). Sanders' "failure to intervene" claim, like the "code of silence" claim, was based purely on speculation, speculation that ran something like this: because police officers were at his house on August 14, 1988, they "must" have seen someone apply excessive force, and, since they "must" have seen someone apply excessive force, they "must" have been able to prevent that application of force. A verdict based only on such assumptions and speculation cannot stand. Accordingly, the motion for judgment as a matter of law is granted as it pertains to the "failure to intervene" defendants.

## II. Motion for a New Trial or Remittitur

Perhaps more troubling than the jury's above discussed disregard of its duty to decide this case based solely on the evidence presented was its decision to award Sanders a total of 1.5 million dollars in *compensatory* damages.[5] Compensatory damages are "such damages as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury." *Blacks Law Dictionary* 204 (5th ed. 1983).

Nearly, if not all, of Sanders' compensable injuries were "intangible."[6] True, Sanders suffered compensable physical injuries on August 14, 1988: two scalp wounds (Sanders testified that at or shortly after the incident in question his head felt as if it had been "bashed-in," but x-rays revealed no skull fracture); a somewhat serious, but non-blinding eye wound; some soft tissue injuries; a broken leg (from which he occasionally limps); and a broken knuckle (a "boxer's fracture").[7] However, because Sanders was arrested and taken into police custody on August 14, 1988, Sanders received medical treatment for those (and other)[8] injuries from the largesse of the state and was not personally charged for the costs of that treatment. In short, Sanders suffered no medical bills from the events of August 14, 1988, and Sanders' physical injuries are therefore only compensable in terms of "pain and suffering."

In addition to the pain he suffered from his physical injuries, Sanders testified that he was humiliated and traumatized[9] by the events of August 14, 1988, and the psychiatrist called as a witness by Sanders testified that Sanders suffers a Post Traumatic Stress Disorder, as evidenced by Sanders' headaches, nightmares, fear of authority, and so forth. Sanders did not, however, present

**5.** Sanders did not request punitive damages—he voluntarily dropped that claim months prior to trial—and a civil rights plaintiff is not entitled to damages based on the abstract value of a violated constitutional right. *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *see Cygnar v. Chicago,* 865 F.2d at 848, n. 21. Sanders was not entitled to, nor did he request, lost wages or compensation for the time he spent in prison on his conviction for the manslaughter of Officer Matt Faber. Also, the jury was not instructed to take into account Sanders' attorney's fees in their damage calculation, since there is a separate federal statute that provides for the payment of attorney's fees at the conclusion of a successful civil rights case. *See* 42 U.S.C. § 1988. Therefore, although it is not clear whether the jury took this added "damage" into account during their deliberations, any allowance for attorney's fees, i.e., doubling the amount of the award on the thought that the attorneys usually take half, would have been beyond the Court's instructions and improper.

**6.** In addition to physical injuries, a civil rights plaintiff has the right to request damages for "intangible" injuries as part of his compensatory

damages, such as damage to reputation, humiliation, embarrassment, pain suffered, and emotional distress. *Cygnar v. Chicago,* 865 F.2d at 848.

**7.** The defendants presented expert testimony that the "boxer's fracture" was likely caused by Sanders making a fist and punching a solid object. On cross-examination, the expert testified that it would be highly unlikely that the injury was caused by an officer striking Sanders' fist with a nightstick. This testimony was unrebutted.

**8.** Because it was undisputed that Sanders initiated the gunfire by being the first one to draw and aim a firearm (the parties contest who shot first), the Court concluded prior to trial that the police officers were justified in shooting Sanders, and the Court instructed the jury that the gunshot injuries Sanders suffered on August 14, 1988 are not compensable.

**9.** Sanders did not present evidence that his reputation was damaged as a result of unconstitutional conduct.

evidence that he incurred any medical expenses related to these problems, nor that future psychological treatment would be necessary; his psychological injuries are therefore not unlike the physical injuries in that they are compensable only on the basis of the "pain and suffering" Sanders' has experienced.

The Court recognizes that it is difficult to pin a precise dollar amount on the intangible damages one incurs from a physical or mental injury, but it is perfectly clear that an award 1.5 million dollars for the type of non-permanently disabling physical injuries Sanders suffered is exaggerated to a point of bearing no relationship to the evidence presented at trial. The amount of this verdict is excessive beyond reason; it is outrageous, shocking the conscience of this Court. The jury, who was not permitted to award punitive damages, assessed liability in one instance at nearly one-half a million dollars against a single, individual officer (Sergeant Knapp). Such a damage award can only be understood as a form of punishment and vindictiveness. The jury exceeded its charge when it acted to punish the individual defendant police officers. It was not its duty, nor was it lawfully authorized, to "send a message" to all police officers that excessive force will not be tolerated, if that was in fact its intention. This verdict so far surpassed its evidentiary basis, one cannot help but wonder whether the larger national social and political climate entered into the thinking of individual jurors, whereby they sought, through this case, to counter-balance other perceived wrongs to other citizens by other police officers in other places. Whatever the jury's rationale, one thing is clear: they most assuredly abandoned their sworn duty to determine damages in accordance with the evidence and the Court's instructions on the applicable law.

■■■ The test to be applied in determining whether a motion for a new trial should be granted is whether (1) the verdict is against the weight of the evidence, (2) the damages are excessive, or (3) for some other reasons, the trial was not fair to the moving party. *Allison v. Ticor Title Insurance Co.,* 979 F.2d 1187, 1196 (7th Cir.1992); *Cygnar v. Chicago,* 865 F.2d at 835. A court may vacate a jury verdict for excessiveness if it is "monstrously excessive," a product of passion and prejudice, or if there is "no rational connection between the evidence on damages and the verdict." *Haluschak v. Dodge City of Wauwatosa, Inc.,* 909 F.2d 254, 256 (7th Cir.1990). In addition to this traditional formulation, the Seventh Circuit has added " 'an additional element to the equation where the case under review is but one of a series of similar cases that establish a trend in damages awards,' i.e., compatibility among such awards." *Cygnar v. Chicago,* 865 F.2d at 848 (citing *Joan W. v. Chicago,* 771 F.2d 1020, 1023 (7th Cir.1985)).

"Damages are awarded in § 1983 actions to compensate individuals for injuries resulting from the deprivation of their constitutional rights," *Busche v. Burkee,* 649 F.2d 509, 518 (7th Cir.[ ] ) [*cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) ], and where the award is not rationally proportionate to awards assessed in similar cases for injuries that are no different in kind from those suffered by the plaintiff, then the award is excessive.

*Joan W. v. Chicago,* 771 F.2d at 1024.

Based on a review of the evidence, the Court concludes that the damages in this case are monstrous and bear no rational connection to the evidence presented, even after removing the vacated claims discussed in the first section of this entry. Further, although it is not clear that a "trend" in damage awards in this area can be gleaned from the available case law, a review of similar cases in this area reveals that this case, by any reasonable standard, is grossly excessive.

For example, in *Taliferro v. Augle,* 757 F.2d 157 (7th Cir.1985), the plaintiff/victim, an African–American writer and commentator on racial oppression, testified that two white police officers accosted him on a street in downtown Chicago and beat him without provocation, inflicting serious injuries that included destroying his dental plate and knocking out many of his teeth. In addition, he alleged that his book manuscript was taken from him at the police station, and because he was never told how he could get it

back, it was destroyed as abandoned property a few weeks later. He also testified that the defendants had on a previous occasion stopped him and asked for identification, and that he had once seen one of the defendants, Officer Augle, at a Nazi rally wearing a Nazi-like uniform and sporting a Hitler-type mustache.

A friend of the plaintiff in the *Taliferro* case testified that when she saw the plaintiff several days after his arrest:

> he looked bad. I had never seen him look like that. His face was all swollen, his mouth. He just look like he had been really ruffled up and his clothes. He looked bad. No doubt about it, he had been beaten up.

The defendants, on the other hand, testified that when they first saw the plaintiff, he was standing in the vestibule of a store long after the store had closed, holding an attache case, with several shopping bags on the ground next to him. The defendants thought he might be up to no good—especially since they had been instructed to be on the alert for possible terrorist activity by the FALN, a Puerto Rican terrorist group. The defendants testified that after the plaintiff cursed them and refused to tell them what he was doing in the vestibule at that hour, the defendants approached. The plaintiff, according to the defendants, swung at them with his attache case. The defendants radioed for assistance, and the group of officers that gathered in response to their call had to use force to subdue the plaintiff and put him into the paddy wagon. The defendants denied using excessive force either during the arrest or later, destroying his property, or accosting him previously; Officer Augle denied having ever attended a Nazi rally.

The plaintiff did not present evidence of the lost manuscript's value, nor did he present any dental bills (despite the plaintiff's claim that he underwent elaborate dental reconstruction), and the only evidence of medical treatment, other than bills amounting to a total of $35, was the plaintiff's "improbable testimony that as a result of the beating he had to be fitted with eyeglasses for the first time." *Id.* at 161. At closing argument, in regard to compensatory dam-

ages, the plaintiff asked for "in excess of" $25,000 for his physical injuries, $100,00 for his emotional distress, and $50,000 for his lost property, the lost property being mainly the destroyed manuscripts. The jury returned a verdict of $47,000 in compensatory damages.

On appeal, the court, recounting the testimony and these damage figures, stated that "all the numbers we have quoted are grossly excessive in relation to the evidence." The court stated that although it can feel sympathy for any author who loses a manuscript, the plaintiff presented no proof concerning the value of the manuscript, that "his lawyer pulled the figure of $50,000 out his hat at closing argument ... [and t]he other figures are equally fanciful." The court held:

> We have criticized the casual attitude of many tort plaintiffs toward proof of damages, see *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 972–74 (7th Cir. 1983), and like other courts have set aside excessive awards of compensatory damages in cases factually quite like this one. *See, e.g., Levka v. City of Chicago, supra,* 748 F.2d [421] at 424–27; [ (7th Cir.1984) ] *Wheatley v. Ford,* 679 F.2d 1037, 1039–40 (2d Cir.1982); *Keyes v. Lauga, supra,* 635 F.2d [330] at 336; [ (5th Cir.1981) ] *cf. Phillips v. Hunter Trails Community Ass'n,* 685 F.2d 184, 190–91 (7th Cir.1982); *but see Clark v. Beville,* 730 F.2d 739, 741 (11th Cir.1984). A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them. The only effort at proof here, besides the proof of $35 in out-of-pocket medical expenses, was [the plaintiff's] testimony that he was distraught and humiliated by his mistreatment at the hands of the police, as well as suffering physical pain. Although it is a painful experience to be manhandled by the police and to have them take away and destroy personal belongings that have at the least a sentimental value, $47,000 is not a reasonable estimate for such an intangible loss when no effort at all is made to establish an objective basis for quantifying the loss. We consider $25,000 the highest compensatory

damages that can be justified on this record.

*Id.* at 162; *see also Bailey v. Andrews,* 811 F.2d 366 (7th Cir.1987) (court held that $55,000 was excessive where a person arrested for disorderly conduct suffered scratched boots, torn pants, flattened glasses (later straightened), and a loss of sleep, but no lost wages or medical bills); *Wheatley v. Ford,* 679 F.2d 1037 (2nd Cir.1982) (court held that $55,000 was excessive when alleged excessive force injuries were temporary and evidence showed that any permanent hearing impairment from perforated eardrum was minor; $25,000 was acceptable if plaintiff was willing to remit all damages in excess); *Kerr v. Quinn,* 533 F.Supp. 1329, (D.C.Conn.), *rev'd on other grounds,* 692 F.2d 875 (2nd Cir. 1982) (court held that $40,000 was excessive where plaintiff suffered at most $1,000 in expenses as a result of excessive force and false arrest; remittitur of $10,000 ordered); *Hagge v. Bauer,* 827 F.2d 101 (7th Cir.1987) ($75,000 not excessive when the police kicked and severely broke a woman's leg, and thereafter, the woman suffered considerable pain and inconvenience, and had to wear full or partial casts for several months, followed by the use of a bone stimulator).

The Court's research discloses no excessive force jury verdict that even approaches the 1.5 million dollar range. The closest excessive force jury verdict the Court could find, if $600,000 short of 1.5 million dollars can be considered close, was *Spell v. McDaniel,* 824 F.2d 1380 (4th Cir.), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1987). In *Spell,* the defendant police officer, without provocation (possibly angered by the arrested plaintiff's failure to respond to questioning), "brutally assaulted" the handcuffed plaintiff, violently kneeing him the groin. The blow to the plaintiff's groin ruptured one of his testicles, necessitating its surgical removal. The assault left the plaintiff deformed and irreversibly sterile. Although the plaintiff's medical expenses only totaled $4,041, the court found that $900,000 in compensatory damages was not excessive, but "eminently sound":

Although [the plaintiff's] medical expenses were relatively low ($2,041), his hospital stay short (four days), and his ability to function sexually not permanently impaired, the evidence showed that the assault caused him intense pain, that his damaged testicle enlarged five to seven times its normal size as a result, that it was like "a smashed piece of fruit" with the outer covering torn and the internal contents passing through the tear, that surgical removal of the testicle led to permanent disfigurement and that, on account of an earlier illness, the assault left [the plaintiff] irreversibly sterile.

The *Spell* case, however, has to be regarded as an anomaly. The next highest excessive force jury verdict was reported in *Herrera v. Valentine,* 653 F.2d 1220 (8th Cir. 1981), which concerns a police officer who kicked and threw to the ground a visibly pregnant woman. The court found that the kick was life threatening and caused the death of the woman's unborn child, and held that a jury verdict of $300,000 was not excessive in light of the woman's physical pain, which continued for three years, and the devastating emotional trauma of her child's stillbirth.

■ Sanders' injuries, considered in this perspective, simply do not match or exceed those that the plaintiffs' suffered in *Spell* and *Herrera;* rather, Sanders' injuries are decidedly more similar to those of the plaintiffs' in *Taliferro* and *Hagge.* As the Seventh Circuit noted in *Bailey v. Andrews,* 811 F.2d at 374, "[c]ases in which an individual is injured by police are difficult to compare because although the cases share a common class of defendants, the claims and damages tend to be very fact specific." However, upon review of the comparable awards cited above ($10,000, $25,000, $75,000), and the Seventh Circuit's opinion in *Taliferro* and *Bailey,* from which this Court must draw guidance, considering the evidence presented in the light most favorable to Sanders, it is the opinion of the Court that the compensatory damages to which Sanders is entitled is $78,000.[10]

**10.** This award does not include an allowance for attorney's fees; that matter will be addressed in a separate entry.

In accordance with the law of this circuit, the Court, therefore, presents Sanders with the option either of accepting a reduction in the award of damages to $78,000 [11] or a new trial.[12] *Haluschak*, 909 F.2d at 256; *McKinnon v. Berwyn*, 750 F.2d 1383, 1392 (7th Cir.1984); *but see Dresser Industries v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir.1992) (when a jury award is the product of passion and prejudice, the proper remedy is a new trial, and not remittitur, because the prejudice may have infected the verdict itself); *Wells v. Dallas Independent School Dist.*, 793 F.2d 679 (5th Cir.1986).

## III. Conclusion

Benjamin Cardozo, the eminent jurist and former Supreme Court Justice, eloquently expressed an axiom of American jurisprudence when he wrote that a trial judge "is not a knight-errant roaming at will in pursuit of [her] own ideal of beauty or of goodness. [She] is to draw [her] inspiration from consecrated principles. [She] is not to yield to spasmodic sentiment, to vague and unregulated benevolence." Benjamin Cardozo, *The Nature of the Judicial Process* 141 (1921). Today, this Court has concluded that it must either remit or set aside the jury's verdict in this case for one very simple reason: because the law demands it. Whether as a reflection of passion, prejudice, punitive motives, or plain error, the jury's decision is contrary to those "consecrated principles" of which Justice Cardozo wrote. The law simply does not permit this Court to allow such a verdict to stand.

How is it, the layman may ask, that a judge may override the fruit of the jury's labor, its verdict, after the jury has listened to witnesses and the arguments of the attorneys, and deliberated long and hard and finally reached a decision? The answer lies, of course, in the allocation of responsibilities between judge and jury. The jury's duty is to determine what the facts are, apply the applicable rules of law to those facts, and render a verdict. The judge's duty is to ensure that the law is fairly administered. In practical terms, this means that the judge must insure that only admissible evidence is submitted to the jury, that the instructions on the applicable legal principles, given to the jury to guide its deliberations, are correct; and ultimately, that the decision the jury reaches is supported by the evidence and is permitted by law.

The issues presented to the jury in this case were narrow and well-defined. They did not include every conceivable theory of recovery either because the Court had previously ruled that they were unsupported by the evidence, or because Sanders, himself, had voluntarily decided to withdraw them. The Court's instructions to the jury presented the only theories upon which Sanders could lawfully recover, and the jurors had no license to deviate from these instructions, to supplement them with their own notions of what the applicable law should be, or to speculate about the existence or compensability of other injuries. Holding the jury to these "consecrated principles" serves the fundamental purpose of protecting the liber-

**11.** The Court, applying the ratio of each defendants' assessed liability vis-a-vis the jury's verdict regarding the remaining claims, apportions the damages accordingly:

| | |
|---|---|
| Officer Fender (excessive force at or immediately inside the front door) | $ 6,000 |
| Officer Knapp (excessive force at or immediately inside the front door) | $42,000 |
| Officer Ward (excessive force after the shooting) | $18,000 |
| Officer Fender (excessive force after the shooting) | $12,000 |

**12.** Alternatively, because substantial issues were initially part of this confusing case when the trial began, but were voluntarily withdrawn or dismissed by the time the case was given to the jury—i.e., the issue of municipal liability as to the Sunday staffing policy, whether Officer Faber had a reasonable suspicion or probable cause to believe that Sanders committed a crime, and whether Officer Faber's entry was illegal—this Court concludes that the trial was not fair to the defendants and a new trial is necessary on this basis as well. *Allison v. Ticor Title Insurance Co.*, 979 F.2d at 1196 (7th Cir.1992). It is the opinion of this Court that the jury verdict is, in too many ways, contrary to the evidence and the Court's instructions, such that the entire verdict is suspect and cannot stand. (For example, even if Officer Ward's conduct at the front door could be considered excessive, it is inconceivable that the jury could rationally conclude that Officer Ward inflicted $50,000 worth of injuries on Sanders by pushing on, but not substantially moving, Mr. Sanders' front door.)

970

ties of both plaintiff and defendant. As Mr. Justice Story, when sitting as a Circuit Justice on the Circuit Court for the District of Massachusetts, explained long ago:

> It is the duty of the court to instruct the jury as to the law, and it is the duty of the jury to follow the law as it is laid down by the court. This is the right of every citizen, and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be not only that the law itself would be most uncertain, from the different views which different juries might take of it, but in case of error there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury.

*United States v. Battiste,* 24 F.Cas. 1042 (C.C.Mass.1835).

Although the precise course and rationale of the jury's deliberations remain beyond the Court's actual knowing, it is obvious that the jury's results are so detached from the controlling legal principles and the evidence presented that the Court has virtually no choice but to make the ruling it has in this entry made. Regrettably from everyone's perspective, the jurors turned to their own instincts for guidance, and the result is a verdict motivated by vengeance, passion, or benevolence—a verdict clearly beyond their lawful commission and charter.

The motion for judgment as a matter of law, as it pertains to the claim that Officer Ward used excessive force at and/or immediately inside Sanders' front door prior to the shooting, the "code of silence"/conspiracy claim, and the "failure to intervene" claim, is GRANTED. In addition, for the reasons stated above, the Court GRANTS the motion for remittitur or a new trial on the remaining claims.[13]

It is so ORDERED.

---

**13.** Note: An order setting a case for a new trial is not final and therefore not appealable under 28 U.S.C. § 1291. Further, a party may not appeal from a judgment to which it consents, and because accepting a remittitur in lieu of a new trial is considered "consensual," the acceptance of a remittitur is also not appealable. *Ash v. Georgia–Pacific Corp.,* 957 F.2d 432, 437 (7th Cir.1992).