**Maria LEVKA, Plaintiff-Appellee,**

**v.**

**CITY OF CHICAGO, a municipal corporation, Defendant-Appellant.**

**No. 84–1055.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1984.

Decided Nov. 19, 1984.

Rehearing and Rehearing En Banc Denied Jan. 2, 1985.

Mary K. Rochford, Asst. Corp. Counsel, Chicago, Ill., for defendant-appellant.

---

David J. Letvin, Letvin & Stein, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Circuit Judge, PELL, Senior Circuit Judge, and DUPREE, Senior District Judge.[*]

PELL, Senior Circuit Judge.

This case presents the question whether a jury verdict in the amount of $50,000 rendered in favor of plaintiff-appellee as compensatory damages for an unconstitutional strip search is excessive. Plaintiff brought this suit pursuant to 42 U.S.C. § 1983, claiming that defendant-appellee, the City of Chicago, violated her civil rights when Chicago police officers subjected her to a strip search after her arrest for a misdemeanor offense. As we have held previously, defendant's former policy searching female arrestees violated both the Fourth Amendment right to be free from unreasonable searches and the Fourteenth Amendment right to equal protection. *Mary Beth G. and Sharon N. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983) (as modified). Because of our prior holding in *Mary Beth G.*, the only question presented to the jury in this case was the issue of damages. Following the jury's award of $50,000 as compensation for emotional injuries, defendant moved for judgment notwithstanding the verdict or, in the alternative, for a new trial or the entry of a remittitur. The district court denied the motion, and defendant appeals.

## I. Facts

According to the parties' stipulated statement of the case, in the early morning hours of December 2, 1975, police arrested plaintiff, then aged 53, for a misdemeanor offense [1] and took her to the police station at Chicago Avenue and State Street. They later transferred her to the Women's Central Detention facility at 11th and State Streets. During her detention at the lockup, police subjected her to a strip search.

At the time of this incident, the City of Chicago enforced a policy of subjecting every arrestee at this lockup to a strip search regardless of the nature of the charge brought against her and regardless of whether reason existed to believe that she carried drugs or concealed weapons. Defendant stipulated that, pursuant to this policy: "The Arrestee was required to lift up her blouse and brassiere. A visual inspection was made. The Arrestee was then told to pull down her pants and pull down her underpants, then to squat several times, stand up and bend over. Again a visual inspection was made." It was the indiscriminate policy of conducting strip searches that we held unconstitutional in *Mary Beth G.*

Plaintiff testified at trial that she was arrested at about 1:55 a.m. on December 2, 1975, on the corner across from her house at 1743 North Sedgwick, Chicago. She was taken to the police station at Chicago Avenue and State Street and telephoned her daughter, April Swenson, between 1:30 and 2:30 a.m., requesting her to come to the station and post $25 bond. When Swenson arrived at the station with her sister's boyfriend and one of plaintiff's neighbors, the police told them that plaintiff had been transferred to the Women's Detention facility. According to plaintiff, when she arrived at the lockup a matron took her to a small cell containing a long bench and a toilet. No other arrestees were present in the cell. The matron who escorted plaintiff to the cell asked her to remove her shoes, then inspected between her toes and placed her shoes outside the cell.

A few minutes later, the matron returned to plaintiff's cell with another matron. The first matron asked plaintiff to pull up her sweater and turn her bra inside-out. After asking "why" and being informed "just do it," plaintiff complied. The matrons conducted a visual inspection

---

* Franklin T. Dupree, Jr., Senior District Judge for the Eastern District of North Carolina, is sitting by designation.

1. The district court granted plaintiff's motion in limine to exclude evidence relating to the nature of the charge brought against plaintiff because such evidence is not relevant to the issue in this case.

from a distance of a couple of feet, and then told plaintiff that she could replace her bra and sweater. Then, one of the matrons asked her to lift up her skirt, pull down her underpants and pantyhose, bend over, and spread her buttocks. Again, plaintiff protested and was told "just do it." Plaintiff complied. Following the search, plaintiff testified, "I felt debased and humiliated and degraded, abused, misused.... I was absolutely shocked and stunned and horrified. I was sickened."

Plaintiff was released from jail about an hour or an hour and one-half after the strip search, approximately forty-five minutes after her daughter arrived at the lockup. When she saw her mother, Swenson testified, plaintiff looked pale and upset, as if she had been crying. After posting bond, they left the Detention Center between 4:00 and 4:30 a.m. Plaintiff recounted the details of the strip search to her daughter and the others while they were in the car and again when they stopped for coffee on the way home. Swenson testified that plaintiff told them that she was very frightened and humiliated by the search and that she cried on and off and seemed very upset. After breakfast, plaintiff returned home where she tried to sleep. She did not fall asleep until about 9:00 a.m.

With respect to the effects of the strip search, plaintiff testified that in the weeks following the strip search she continued to be frightened and became afraid to go out alone at night. She testified that if she tried to go out alone, she would return home and fall apart. According to plaintiff, her fears became so pronounced that she consulted a psychiatrist one month after the search.[2] She did not return for further consultation. As a result of the search, plaintiff claims that she continues to be afraid and that even now she will not go out alone at night. In fact, she testified that she no longer sees movies or attends parties, the ballet, or the theatre. Admittedly, plaintiff cannot separate the impact of her arrest from the impact of her strip search.

At trial, plaintiff produced four witnesses to corroborate her testimony that she has suffered continuous and deep emotional trauma as a result of her strip search. First, her daughter testified that during the two to three weeks following the search, she talked to her mother two to three times a week. Often during these conversations, plaintiff expressed to her daughter that she felt humiliated and afraid, and that she was frightened of the police and fearful for her own safety. Swenson testified that plaintiff does go out alone during the day, but will not go out at night unless accompanied by an escort. Second, Bonnie Deutsch, a neighbor of plaintiff's for the last thirteen years, testified that she noticed a change in plaintiff's behavior in 1976, and that she no longer sees plaintiff outdoors anymore. Although Deutsch learned of plaintiff's encounter with the police in January of 1976, she did not learn of her strip search until one or two months before the trial. On cross-examination, she admitted that she has no knowledge of whether plaintiff is employed or married.

At the time of the strip search, plaintiff worked as a booking agent for various musicians. As part of her job, plaintiff visited various clubs during the night and early morning hours to listen to musicians. Plaintiff offered the testimony of her third and fourth witnesses to corroborate her claim that she could not maintain her job as a booking agent because of her fear of going out alone at night. Lynn Roeder, a professional musician who has known plaintiff for the last 14 years, testified that plaintiff refused her request to act as her agent in 1976, although plaintiff had acted previously as her agent for one to one and one-half years between 1970 and 1972. According to Roeder, after inquiring for almost a year, she learned that plaintiff would not act as her agent because she was afraid to go out at night. On cross-examination, however, defendant impeached Roeder's credibility by pointing out that in an earlier deposition she had testified dif-

---

**2.** The parties could not locate the psychiatrist, Dr. Jordon Shere, to testify.

ferently as to the date when plaintiff stopped booking her. Finally, Oett Mallard, a member of the Chicago Musician's Union and its examining board who has known plaintiff since 1969, testified that plaintiff continued to bring clients to the board for auditions through 1977 or 1978. While he stated that plaintiff brought in fewer musicians in 1977, he admitted that the booking agent business suffered a general slowdown in 1978 or 1979.

To refute plaintiff's claim that the strip search caused her to become a "prisoner in [her] own home," defendant put witnesses on the stand who testified that they have seen plaintiff outside her home on a number of occasions since December 1975. John Danek, a police officer, testified that he saw plaintiff shopping at the neighborhood grocery store two to three times a month during the time that he worked there as a security guard, between 1973 or 1974 and 1975 or 1976. Subsequent to December 1975, Danek stated, he has continued to see plaintiff two to three times a month in the neighborhood and at the grocery store. Further, Danek testified that he has seen plaintiff alone at night on some occasions.

James Shelton, a bartender in the neighborhood who has known plaintiff for over twenty-five years testified that prior to 1975 he had seen plaintiff approximately twelve times a year. Following her strip search, he has seen plaintiff approximately six to eight times a year at the grocery store, at the restaurant in which he works, and once at a church function. Shelton stated that he saw plaintiff alone at the church function at night, but did not know whether she left alone.

Casimir and Barbara Krasuski, neighbors of plaintiff for over twenty years testified that they have not noticed any change in plaintiff's behavior after 1975. More specifically, Casimir Krasuski stated that he was unaware of any change in frequency with which plaintiff entered and left her apartment subsequent to the strip search. Barbara Krasuski has seen plaintiff two to three times a week since 1975 and has seen her coming and going at night both before and after 1975. Although she does not see plaintiff as frequently now as she did prior to 1975, Krasuski now holds a full-time job and, hence, has less opportunity to see plaintiff. Additionally, she testified that plaintiff came to her apartment recently and told her that she was beginning work that day at Roosevelt Hospital from 3:00 p.m. until 11:00 p.m. She does not know whether plaintiff actually worked those hours.

Finally, defendant's last witness, E.H. Trisko, the secretary-treasurer of the Chicago Federation of Musicians, testified that plaintiff's membership in the union lapsed for non-payment of dues in June of 1977. According to him, plaintiff paid dues to the union at least as late as December, 1976, one year after her strip search.

After listening to all of the evidence for three days, the jury returned a verdict in favor of plaintiff in the amount of $50,000. The full amount of the award constituted compensation for "[e]motional trauma and distress, mental and physical suffering, anguish, fear, humiliation and embarrassment." With respect to plaintiff's claims for both lost earnings and loss or impairment of earning capacity, the jury found in favor of defendant, awarding no damages to plaintiff on either of those claims.

## II. The Damage Award

In reviewing a jury verdict for damages to determine whether it is excessive, we must defer to the judgment of the jury unless the award is "monstrously excessive" or "so large as to shock the conscience of the court." *Mary Beth G. and Sharon N. v. City of Chicago,* 723 F.2d 1263, 1275 (7th Cir.1983) (as modified); *Huff v. White Motor Corp.,* 609 F.2d 286, 197 (7th Cir.1979); *Galard v. Johnson,* 504 F.2d 1198, 1199 (7th Cir.1974) ("To reverse the judgment below, we must conclude that the verdict was so 'gross' or 'monstrously excessive' that the trial judge abused his discretion in permitting it to stand."). *See Hintz v. Jamison and Township of Dix,* 743 F.2d 535, 539 (7th Cir.1984); *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d

963, 971 (7th Cir.1983). Under this standard, while we must accord substantial weight to the determination of the jury on the issue of damages, we must also set aside the award if we decide that the award is grossly excessive. One factor we must consider in determining whether to set aside an award is whether the award is out of line compared to other awards in similar cases. *Mary Beth G.,* 723 F.2d at 1275.

In the nine damage suits brought against the City of Chicago by women who were subjected to unconstitutional strip searches, the juries have awarded compensatory damages ranging from $3,300 to $112,000. More particularly, the juries returned verdicts in the following amounts: one for $3,300 (*Blanca v. City of Chicago,* No. 82 C 1911 (N.D.Ill.1982)); two for $15,000 (*Susan B. v. City of Chicago,* No. 83 C 228 (N.D.Ill.1983)); (*Stella S. v. City of Chicago,* No. 82 C 1912 (N.D.Ill.1983), *appeal dismissed,* No. 84–1118 (7th Cir. 1984)); two for $25,000 (*Mary Beth G. and Sharon N. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983) (as modified)); one for $30,000 (*Id.*); one for $45,000 (*Mary T. v. City of Chicago,* No. 83 C 2942 (N.D.Ill. 1984)); and, one for $112,000 (*Joan W. v. City of Chicago,* No. 83 C 0327 (N.D.Ill. 1984), *appeal docketed,* No. 84–2060 (7th Cir. July 6, 1984)). Comparing the $50,000 award in this case with the awards in the other strip search cases, this award stands out as remarkably high. We are persuaded further of its inconsistency with prior awards by reviewing the facts of the three cases in which the juries returned verdicts over $30,000. In those cases, aggravating circumstances existed that distinguished these three searches from the strip searches to which the other women and plaintiff in this case were subjected.

In *Mary T.,*[3] the case in which the jury returned a verdict in the amount of $45,000, a plaintiff was subjected to a cavity search. In her complaint, plaintiff also alleged that the matron felt her breasts and

threatened that if she did not comply with the strip search male officers would be called in to assist with the search. In finding in favor of plaintiff in this case, the jury attributed seventy-five percent of the $45,000 award to damages arising out of the cavity search.

Similarly, the presence of aggravating circumstances in *Joan W.* throws light on the jury's award of $112,000. In denying defendant's motion for judgment notwithstanding the verdict, or a new trial, or the entry of a remittitur, Judge Getzendanner noted that the matrons were hostile towards plaintiff when conducting the search, that they "ridicul[ed], shout[ed], taunt[ed], and threaten[ed]," that they referred to plaintiff's body in foul and vulgar terms, and that they "forced her repeatedly to squat and to push her fingers into her vagina and rectum, all the time yelling to her that she was not doing it good enough, forcing her to weep and bend to their will." No. 83 C 0327 (N.D.Ill.1984) (memorandum opinion and order denying defendant's motion for judgment notwithstanding the verdict, a new trial, or to approve a remittitur), *appeal docketed,* No. 84–2060 (7th Cir. July 6, 1984). In upholding the jury's award, Judge Getzendanner emphasized that plaintiff possessed certain frailties prior to the strip search that caused her to be particularly susceptible to the damaging effects of the strip search.

In the only case in which this court has addressed the issue of excessiveness of damages arising from unconstitutional strip searches, we upheld two awards in the amount of $25,000, one award in the amount of $30,000, and one award in the amount of $60,000. *Mary Beth G.,* 723 F.2d 1263. With respect to the first three awards, we determined that plaintiffs introduced sufficient evidence of emotional and mental distress to support the awards and emphasized that the awards were consistent with one another. *Id.* at 1275. In reviewing the $60,000 award to Hinda

---

**3.** Defendant in *Mary T.* has filed a motion for judgment notwithstanding the verdict, or a new trial, or the entry of a remittitur. The motion is pending presently before Judge Plunkett, United States District Court for the Northern District of Illinois.

Hoffman, we first ordered a remittitur reducing the award to $35,000 in order to bring it in line with the other awards, noting that, "[w]hen placed against the other awards, the $60,000 is excessive." Nos. 82–1894, 82–1920, 82–2605, 83–1618 & 83–2203, slip op. at 21–22 (7th Cir. Nov. 29, 1983). Although we denied plaintiff's petition for rehearing and suggestion for rehearing en banc, we subsequently modified our first opinion and affirmed the $60,000 award. We based our modification, in part,[4] on the presence of aggravating circumstances surrounding the search of Hoffman. In her complaint, Hoffman alleged that she was strip searched in front of a camera and in the presence of two male police officers and a group of jeering prostitutes. Although this court allowed the award to stand, we reaffirmed the principle that an award may be set aside or reduced if it is "out of line with a clear trend of awards at lesser amounts." *Id. See Phillips v. Hunter Trails Community Association*, 685 F.2d 184, 190 (7th Cir. 1982).

█ Comparing the facts of this case to the facts of the three cases in which juries returned awards exceeding $30,000,[5] we find that the award of $50,000 in this case is grossly excessive and must be reduced. The existence of aggravating circumstances in the other three cases precipitated the large awards in those suits. Here, no comparable aggravating circumstances exist. Plaintiff was not subjected to a cavity search, nor was she forced to probe herself. In this case, the matrons conducted the search in private, out of the presence of male officers, other arrestees, or a camera. Unlike the matrons in some of the other cases, the matrons in this case were pleas-

ant and matter-of-fact, never threatening to plaintiff. In fact, fewer aggravating circumstances existed in this case than in two of the cases in which the juries returned lesser damage awards. In *Susan B.*, the jury awarded $15,000 to a woman who was ordered to squat five times despite her objections that she had not recovered from a recent hysterectomy and that a strip search would cause her substantial pain and create a threat of injury. No. 83 C 228 (N.D.Ill.1983). In *Stella S.*, the jury awarded $15,000 to a woman who was subjected to probing by a police officer of her vaginal and rectal openings. No. 82 C 1912 (N.D.Ill.1983).

Whatever the extent of our review of trial evidence may be ordinarily, the Supreme Court has mandated that when we are called upon to determine whether a jury award is excessive we must "make a detailed appraisal of the evidence bearing on damages." *Grunenthal v. Long Island Rail Road Co.*, 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968). *See Huff v. White Motor Corp.*, 609 F.2d 286, 296 (7th Cir.1979). The plaintiff simply has not offered any evidence to suggest that the strip search to which she was subjected was performed in any aggravated manner. In her brief, plaintiff argues that her age constituted an aggravating circumstance that justifies the $50,000 award in this case. While we believe that the particular frailties which some plaintiffs possess prior to being subjected to a strip search may make those women more susceptible to emotional damage than other women, we are not persuaded that plaintiff's age is such a frailty in this case.

4. In affirming the award, we noted that one award was almost as large, referring to the award in this case. 723 F.2d at 1275 n. 11.

5. In oral argument, plaintiff mentioned a case recently decided by the United States District Court for the District of Massachusetts in which the jury returned a verdict of $150,000 for a woman subjected to a strip search. *Cole v. Snow*, 586 F.Supp. 655 (D.Mass.1984). In that case, plaintiff was not an arrestee but a visitor to the prison where her brother was serving a

sentence. She was strip searched on three different occasions, and on at least one occasion the matron was hostile. The matron touched plaintiff while inspecting her breasts and rectum. A psychiatrist testified to the extreme emotional effects of the search of plaintiff, and plaintiff testified that due to the strip search she became sexually dysfunctional. As compensation for both emotional and *physical* injuries, the jury awarded $150,000.

While we defer to the jury's determination that plaintiff did suffer some emotional distress in this case, after considering the evidence in this case, we cannot agree that the evidence justifies a compensatory award of $50,000. Not only does defendant's evidence refute any suggestion of the presence of aggravating circumstances, but it also controverts plaintiff's testimony that she has become a prisoner in her own home as a result of the strip search. Defendant produced three witnesses at trial who testified that they have observed plaintiff outside her home on a number of occasions since the strip search. Of the three, two stated that they had seen plaintiff out at night; one of the two recalled seeing her alone in her neighborhood and at the grocery store at night from time to time since 1975.

While we recognize, as we must, that the jury was free to disbelieve the defendant's witnesses, nevertheless, in examining the evidence, we are also mindful that the jury in its verdict reflected its opinion that her emotional distress and mental suffering was not such as to have been the cause of her claimed loss or impairment of earning capacity. We are left with the distinct impression from all the evidence that the jury was in fact assessing punitive rather than compensatory damages which was beyond the scope of the issues presented to it.

While we do not belittle the distress that plaintiff sustained as a result of her strip search, we think that the evidence simply does not support a damage award of this magnitude. Although plaintiff testified that she visited a psychiatrist about one month after the strip search, one isolated visit to the psychiatrist, is inconsistent with plaintiff's contention that she was suffering from severe and continuing trauma. Thus, in light of all the evidence and in light of the awards rendered in other strip search cases, we are of the opinion that a remittitur of $25,000 would be appropriate. Because of the absence of aggravating circumstances in this case, a compensatory award of $25,000 comports with the verdicts returned in similar cases and compensates plaintiff for the distress that she suffered as a result of the search.

### III. Conclusion

For the foregoing reasons, we hold that the jury's award of $50,000 compensatory damages for emotional injury must be set aside as grossly excessive. The district court's order is REVERSED, the judgment is VACATED, and this case is REMANDED to the district court pursuant to Circuit Rule 18 with directions to hold a new trial unless plaintiff accepts the entry of a remittitur reducing the award to $25,000.