360

(No. 90-CC-3480–

NANCY RODES and WILLIAM RODES, Claimants, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 6, 1994.*

DENNIS J. KELLOGG, for Claimants.

ROLAND W. BURRIS, Attorney General (PAUL CARL-
SON, Assistant Attorney General, of counsel), for Respon-
dent.

## OPINION

SOMMER, C.J.

This cause comes before the Court on a complaint
filed by the Claimants, Nancy Rodes and William Rodes.
The complaint alleges that Nancy Rodes and her father,
William Rodes, incurred damages because the Secretary
of State supplied incorrect driver's license information to
a Federal park police officer in the State of Arizona on
September 25, 1989, indicating that the driver's license of
Nancy Rodes was suspended. It is alleged that this trans-
mittal of incorrect information caused Nancy Rodes to be
jailed overnight in Arizona, to be made subject to arrest

proceedings, and to have her motor vehicle towed. The Claimants seek a total of $25,000 in damages.

A hearing was conducted on June 12, 1992. The Claimants were represented by counsel. Subsequent to the hearing, each party filed a brief in support of their respective positions.

## Testimony of Nancy Rodes

Nancy Rodes (hereinafter referred to as "Nancy") testified that on September 25, 1989, she was driving a 1984 Chevy Blazer, license plate number ADK131, in the Petrified Forest National Park of Arizona. She was stopped for speeding by a Federal park police officer, and was arrested for driving while her driver's license was suspended. No speeding charge was made. She was searched, handcuffed, and driven to jail, and her vehicle was towed. She was told to shower and to put on clothes with the word "jail" on them. The jail and shower were in bad condition. She spent the night in jail and was released the next morning.

At the hearing Nancy said she was a little afraid of the woman in her jail cell. At her deposition, Nancy said she was not afraid of the other person in the jail cell. Nancy stated that her father told her that he wanted to fly out and drive back with her because he didn't want her to drive alone. She did not ask him to come out. He said he was afraid she would "suffer some kind of after-shock."

At the hearing Nancy said the incident still bothers her and she feels intimidated. In her deposition Nancy said that she was not suffering from the arrest incident in any way.

Nancy stated that she received the Claimant's Exhibit No. 5 in the mail and identified it as a Clean Air

Vehicle Emission Test Report with a test date of April 9, 1988, and with a pass sticker affixed. Nancy identified the Claimant's Exhibit No. 6 as a vehicle emissions test report with a test date of February 7, 1989, and with a pass sticker on it. The Claimant's Exhibit No. 7, receipts of the towing bill, were admitted without objection.

Nancy stated that she received a whole bunch of notices regarding emissions testing and took them with her to the IEPA emissions test station on February 7, 1989. IEPA personnel told her that she might as well test since she was there. She received another notice after the February 7 test but she disregarded it and "figured it was just caught up in the system."

Nancy testified that she moved from 238 Delphia, Park Ridge, to 248 Kosan Circle, Streamwood, sometime around September of 1988, and she notified the Secretary of State to change her driver's license to reflect the change in address. She believed her vehicle was registered at the Park Ridge address. She received vehicle emissions notices at the Park Ridge address. The notices told her to have her vehicle tested. She did not check the VIN on the notices. She stated that she did not know of ever receiving any notices in 1988 from the Secretary of State telling her that her license plates and driver's license were going to be suspended.

Nancy identified her signature at the bottom of the Respondent's Exhibit No. 3, which is an application for registration, dated June 5, 1987. The VIN on the application is 1G8CT1887E0188579. The Respondent's Exhibit No. 3 was admitted into the record without objection. The Respondent's Exhibit No. 4 is a registration application dated September 2, 1990. The Respondent's Exhibit No. 4 was admitted into the record over an objection for a limited purpose. The Respondent's Exhibit No. 4 references

a VIN where the eighth and ninth digits appear to be either "13" or "B."

The Claimant's Exhibit No. 8 is a registration application for Nancy's car. She agreed that the VIN on the Claimant's Exhibit No. 8 was the correct VIN and the VIN on the Respondent's Exhibit No. 3 was different. The Claimant's Exhibit No. 8 was admitted without objection.

### Testimony of William Rodes

William Rodes, a resident of Chicago, Illinois, testified that on September 25, 1989, his son, who lived in Phoenix, called him and told him that Nancy had been arrested. William Rodes (hereinafter referred to as "William") called the county jail in St. Johns, Arizona and talked to a deputy sheriff and a matron. Subsequently, he called his son and called the matron to express his concern for Nancy's safety.

At approximately 10:40 a.m. on September 26, 1989, William had a telephone conversation with Nancy. Nancy called to inform William that the sheriff had released her. She called William later, and he informed her that he would fly out.

At the time of the occurrence, William worked as a rehabber, buying apartment buildings and rehabbing them. He was in the process of rehabbing a four-apartment building. He flew to Arizona on October 6. He stayed in Arizona five or six days before he and Nancy drove back to Chicago.

William stated that he was concerned for Nancy's physical safety while she was in jail. After arriving in Arizona he noticed that she was not as outgoing, happy or enthusiastic as she had been prior to the incident. Her

demeanor and attitude change continued for four to six weeks. She did not seek psychological counseling or see any mental health personnel.

William claims $2,109.43 in expenses. William identified a five-page document, marked as the Claimant's Exhibit No. 3, as a report prepared by him indicating the times he called various people. The first page is a summary of the expenses claimed by him, including expenses relating to telephone calls, air fares, motel, and loss of income. Pages two through five of the exhibit are copies of receipts in support of the claim. William specifies his income at $25 per hour. The Claimant's Exhibit No. 3 was admitted into the record without objection.

William testified that he reports paying himself $200 per day to the Internal Revenue Service. He does not draw a week's salary but pays himself when the building is sold. William was working on a project when Nancy first contacted him on September 26, 1989. He completed the work he had started and then went to Arizona on October 6, 1989.

### Testimony of Nancy Anderson

Ms. Nancy Anderson, an employee of the State of Illinois, was called as a witness by the Claimants. Anderson has served as the manager of the Auto Emissions Section within the Office of the Secretary of State (hereinafter referred to as "Secretary"), since September, 1985. Her job involves the enforcement of the Illinois Vehicle Emissions Test Program. The emissions testing laws are enforced by suspending the driver's license of the owner of a motor vehicle if the motor vehicle and its owner are not in compliance with the emissions testing program. Anderson's section is responsible for suspending licenses and restoration of the licenses when the vehicle is in compliance.

When an individual's driver's license is suspended, the pertinent information is made available, through reciprocity, to other states. The data processing department of the Secretary of State prepares the suspension notices.

The Illinois Environmental Protection Agency (hereinafter referred to as "IEPA") notifies Anderson's section when a vehicle has not taken the emissions test. IEPA sends an enforcement computer tape for an assigned month. The tape describes motor vehicles by listing each vehicle's identification number, license plate, the year, the make, model, owner's name and assigned month.

The chronology of events leading to a suspension under the vehicle emissions testing procedures were described by Anderson as follows. A vehicle owner is assigned a month to have the emissions tested. The owner has four months from the time of the assigned month to have a vehicle tested. IEPA sends an initial notice to the owner a month ahead of the assigned month. In the event the vehicle does not pass or take the emissions test in the assigned month, IEPA would send a first warning notice the month after the assigned month. In the third month after the assigned month IEPA would send a final warning notice. At the beginning of the fourth month after the assigned month, IEPA would send the computer tape for the assigned month to Anderson's section.

Anderson's section would, within 15 days of receipt of the IEPA tape, send a first warning notice to the address (in this case Park Ridge) indicated on the IEPA enforcement tape informing the owner that the vehicle did not pass an emission test, and advising the owner that his or her driver's license will be suspended in 60 days unless the vehicle passes a test. In the fifth month after the assigned month, Anderson's section would send a final warning notice (in this case Streamwood) to the

address on the owner's driver's license stating that the owner's driver's license will be suspended if the vehicle has not complied with the emissions testing law. In the sixth month after the assigned month the vehicle owner would receive (in this case at Streamwood) a notice of driver's license suspension, with certification of mailing. That notice informs the driver that the suspension will be effective in another 30 days. Thus, the Secretary sends three notices before the suspension is entered, with at least one going to the registration address and the others to the driver's license address.

Anderson stated that Nancy Rodes' driver's license was suspended October 20, 1988. On or after September 25, 1989, someone communicated with a technician in Anderson's section regarding the driver's license of Nancy Rodes. As a result of the communication, the suspension of Nancy Rodes' license was removed on September 26, 1989.

Subsequent to the removal of the suspension, a form letter was sent to Nancy Rodes. The letter was marked as the Claimant's Exhibit No. 1 and was not offered into, and is not part of the record, but was used to refresh the recollection of the witness. Although Anderson's signature was stamped on the letter by a rubber stamp, she did not review the letter before it was mailed. The letter contained the statements "The suspension was entered in error," and "we regret any inconvenience this matter may have caused." Anderson explained that the statements meant, "(The error) was called to a technician's attention that the suspension should not have been entered. The individual had a document or something in their possession that we were not aware of, could not be aware of."

The letter also states, it was "caused during the process of updating vehicle registration information." Anderson explained that the statement meant, "The individual

obtained a registration or renewed a registration, and at a point an error was made in the vehicle identification number which resulted in the suspension." The Claimant's counsel asked Anderson whether the letter indicates Nancy Rodes actually had a valid Class A driver's license which had a later expiration date. Anderson responded by stating "Once the suspension was removed it was a valid license, yes." Anderson agreed with the conclusion that the driver's license of Nancy Rodes should not have been suspended within one year prior to September 25, 1989. Anderson agreed that the information regarding the suspension was communicated to the State of Arizona or its representatives. On recross examination, Anderson noted that the VIN on the letter was 1G8CT1887E0188579.

During cross-examination, Anderson identified and testified to the meaning of the three pages making up the Respondent's Exhibit No. 1. The first page of the exhibit certifies that:

"A Vehicle Emissions Suspension was entered suspending the driving privileges of Nancy M. Rodes [ ], on October 20, 1988, and said suspension was removed from the record on September 26, 1989, based on evidence reviewed that the date indicating the suspension was entered in error during the process of updating vehicle registration information."

Res. Ex. No. 1, pg. 1.

Page three of the exhibit indicates that Nancy Rodes was mailed, on September 20, 1988, a notice of driver's license suspension stating that her driver's license was suspended effective October 20, 1988, for failure to comply with emissions testing laws. Page two of the exhibit is the notice of driver's license suspension indicating Nancy Rodes' address at 248 Kosan Circle, Streamwood, Illinois. The notice references VIN 1G8CT1887E0188579 and license plate number ADK 131. The exhibit was admitted into the record without objection. Anderson identified her signature on page three of the exhibit.

The Respondent's Exhibit No. 2 was identified by Anderson as three pages of photocopies of a microfiche copy of a print of a computer tape created when loading records into the enforcement data base. The Respondent's Exhibit No. 2 was admitted into the record without objection. The copies describe action taken by Anderson's section in regards to Nancy Rodes specifying that the record was received from IEPA for enforcement and that notice was sent on July 9, 1988. The VIN on the entry is 1G8CT1887E0188579 and the plate number is ADK 131, which are the same as indicated on the Respondent's Exhibit No. 1. This notice mailed on July 9, 1988, went to the address on Nancy Rodes' registration file (238 Delphia, Park Ridge) at the time of application for her license plate.

The second entry indicates that on August 17, 1988, a final warning notice was printed to be mailed to Nancy Rodes, page two, Respondent's Exhibit No. 2. The VIN and plate numbers are identical to the first entry. This notice was shown to have been mailed to the address of Nancy's driver's license (248 Kosan Circle, Streamwood).

The third entry indicates that on December 15, 1988, the enforcement data base ran a request to suspend the license plate ADK 131. The VIN is identical to the prior entries. Notice of this action would have been sent to the address on Rodes' current registration (238 Delphia, Park Ridge). This action did not include a suspension of Rodes' driver's license.

### Testimony of Katherine Allen

Katherine Allen, an assistant administrator in the Office of the Secretary of State, is responsible for vehicle services operations in Cook County which involves registration and title of vehicles. She is familiar with the procedures for changing or correcting titles and registration

applications. Changes are made on the original application when an application cannot go through the system.

In relation to the Claimant's Exhibit No. 8, an application for registration initially dated June 5, 1987, Allen stated that the title number in the upper right hand corner had been scratched out and a new title number was assigned in the lower left hand corner.

Allen said the application was rejected by the computer as it was being keyed in. She believed the Secretary of State's office would have researched the problem. She noted that there is a serial number (VIN) underneath the one written in the appropriate area. In the event a vehicle registration application is put in and one digit of the VIN is wrong, the vehicle cannot be processed. The VIN on the application has to connect with and match the VIN on an existing title file. When it doesn't, it kicks out an error that must be manually researched.

Based upon the appearance of the Claimant's Exhibit No. 8, Allen thought that it represented an instance where a wrong VIN was submitted on the registration application, it was kicked out in error, manually researched, and was corrected. She noted that the serial number underneath the corrected serial number is 188. The exhibit does not indicate the date the change was made, but it does indicate that the validation date was June 5, 1987. A corrected application is not returned to the applicant.

Allen speculated that when Nancy Rodes filled out the application she transposed the numbers as 188 rather than 18B.

## Analysis of Claim

For claimants to recover against the State, they must prove by a preponderance of the evidence that negligent

acts of the State proximately caused the claimant's injury and the claimants were free from contributory negligence. (*Bellamy v. State* (1990), 43 Ill. Ct. Cl. 337; *Arterburn v. State* (1990), 43 Ill. Ct. Cl. 246.) The requirements to be free of contributory negligence should be interpreted consistently with section 2—1116 of the Code of Civil Procedure. 735 ILCS 5/2—1116 (1992).

Prior to making a determination of negligence, it must be demonstrated that the State had a duty to the Claimants and breached that duty. Neither party has cited a case which would operate as a precedent for determining whether the State had a duty to the Claimants under the facts presented. A review of the reported cases before the Court do not reveal any case with a similar fact pattern. Whether or not the State owes a duty to a person is a question of law. (*Wheel v. State* (1990), 42 Ill. Ct. Cl. 231.) The Claimants allege in their brief that, by creating an internal procedure for correction, the Respondent has a duty to ensure the information contained in its records is accurate.

Based upon the evidence presented, the Court finds the facts to be as follows. On June 5, 1987, Nancy prepared and submitted to the Secretary, an application for registration of her motor vehicle. The application identified her address to be in Park Ridge. The VIN provided by Nancy included errors. The Respondent's Exhibit No. 3 is a copy of Nancy's application prior to corrections or changes, and shows the eighth digit of the VIN to be an "8." The Claimant's Exhibit No. 8 is a copy of the same application with corrections. The initial VIN is whited out or obliterated and a new VIN inserted with the eighth digit of the VIN being a "B." The Respondent's Exhibit No. 3 also identifies the old title number as "B6442074" and Claimant's Exhibit No. 8 shows that number crossed out and "C7541598" written above it.

When the information from the erroneous application was keyed into the Secretary's computer, it was rejected because the VIN number did not match any title records maintained by the Secretary of State's Office. The Secretary's staff, pursuant to its policy, manually checked the information and corrected the VIN on the application.

The Secretary is prohibited from registering or renewing a registration of a vehicle unless a certificate of title has been issued to the owner. (625 ILCS 5/3—101 (1992).) Section 3—409 of the Illinois Vehicle Code specifies in relation to registrations that "[t]he Secretary of State shall file each application received and when satisfied as to the genuineness and regularity thereof, and that the applicant is entitled to register such vehicle and to the issuance of a certificate of title, shall register the vehicle * * *." (625 ILCS 5/3—409 (1992).) The statute imposes a duty on the Secretary to satisfy itself on the genuineness and regularity of each application and on the applicant's entitlement to registration of the vehicle. In short, the Secretary should not issue license plates or renewal stickers until the registration application is correctly matched to a title on file. When first submitted in this case, the Secretary was unable to make that match.

The date that the Secretary corrected the application is not in the record. The date that the license plates or sticker, with a registration card, was issued or sent to Nancy is also not in the record. What is in the record is the admission of the Respondent that Nancy was not informed of the VIN error on her application, or of the corrections made to it.

Apparently the Secretary created some type of file or record with the erroneous VIN, together with Nancy's name and address, and a separate file or record with the correct VIN, and Nancy's name and address. The nature

of the file or record created with the incorrect VIN is not fully disclosed in this record.

The Illinois Vehicle Code requires the Secretary to provide the IEPA with information for the purpose specified in the Vehicle Emissions Inspection Law, including providing regular and timely access to vehicle registration records. (625 ILCS 5/13A—112 (1992).) Apparently files or records containing both VINs were made available to IEPA. The date and manner in which the files or records were made available to IEPA for emissions testing is not in the record.

The VIN with a "B" in the eighth digit is the correct VIN. The Respondent's exhibit nos. 1 and 2 pertain to the incorrect VIN with an "8" in the eighth digit. Under this fact scenario the Secretary was not under any requirement to create a file or record for an application for registration that would be accessible by IEPA until such time as the Secretary could satisfy himself that the vehicle could be registered. The Secretary could not have satisfied himself until the manual search was completed and corrections were made that allowed the VIN on the application to match the VIN on a title. Until such time the Secretary should have safeguarded and prevented the information from the erroneous application form being readily available to the IEPA. Having discovered the error, the Secretary should have safeguarded or prevented the erroneous information from being made available to the IEPA.

In the event the facts were to stop at this point the outcome of this case might be different. But, there is the matter of the notices being sent to Nancy.

The Respondent's Exhibit No. 1 shows that notice was mailed on September 20, 1988, to Nancy stating that her driver's license would be suspended on October 20,

1988, unless she acted. Albeit, the notice was for the incorrect VIN, with the "8" in the eighth digit, it was still notice to her. The notice came from the Secretary's office mailed to Nancy's Streamwood address. There is nothing in the record to indicate that she contacted the Secretary regarding a notice of suspension. Nancy denies receiving the notice of suspension.

The Claimant's Exhibit No. 5 shows that Nancy's vehicle, based upon the correct VIN with a "B," passed the emissions test on April 9, 1988, and was not scheduled for another test until February, 1989, when the Claimant's Exhibit No. 6 indicates Nancy's vehicle again passed the emissions test. There is nothing in the record that would indicate whether IEPA would have known that Nancy's driver's license was suspended at the time of the February, 1989 test.

A review of case law reveals two cases in which it was alleged that the negligence of the Secretary of State caused damages. Neither case is on point, but are helpful in the present analysis. In *Bank of Lyons v. State* (1966), 26 Ill. Ct. Cl. 104, the claim was made by a bank that held a security interest, identified on the certificate of title, to a motor vehicle as security on a loan to one of its customers. The customer defaulted on the obligations of the loan and applied to the Secretary of State for a duplicate certificate of title. Subsequent to the issuance of the duplicate, the bank obtained possession of the duplicate and the motor vehicle. The motor vehicle was later stolen from the bank's premises. The bank claimed that the Secretary's mistaken issuance of the duplicate caused the bank to lose the motor vehicle. The Court's opinion assumed negligence on the part of the Secretary, but held that the conduct of the Secretary was not the proximate cause of the bank's loss.

In a more compelling case, *Kirby v. State* (1979), 32

Ill. Ct. Cl. 419, the Secretary of State incorrectly reinstated a driver's license to an individual, although the applicant had not complied with the necessary laws and procedures. The individual subsequently was found to have caused the death of a person in an accident while driving under the influence of intoxicating liquor. The Court held that the State was not the proximate cause of the death of the person.

It is clear that Nancy provided the wrong VIN number when she registered her automobile. The Court understands the ease by which a wrong digit or letter could be entered in a 17 place VIN composed of numbers and digits, which seem random to the average car owner. This is one reason why the Secretary of State runs the VIN numbers submitted to it against master lists.

Nancy testified that she had a "whole bunch" of "vehicle emissions" notices. Her concern over these notices caused her to go to the IEPA testing station on February 7, 1989 to find out about them. When she showed the notices to the testing employees, they must have had no particular reaction, as they urged her to re-test as she had only a couple of months left on her 1988 sticker. She was not told that her license and plates had been suspended. This leads this Court to conclude the employees at the testing station were using only the VIN number—the correct one in this case, and failed to notice the subtle difference between the correct VIN and the wrong VIN on some of the notices.

In regard to the incorrect VIN number, Nancy had been sent a final warning and a notice of her driver's license suspension at her address at Streamwood, Illinois. Apparently, notices of revocation of her license plates were sent to her registration address at Park Ridge, Illinois.

Nancy testified that she received no final warning or notice of her driver's license suspension at her Streamwood address in 1988, though she testified that she received mail sent to her Park Ridge address, Streamwood address, and an address in Chicago during the time in question.

We find that Nancy was sent a final warning in August of 1988 and a notice of her driver's license suspension at her Streamwood address in September of 1988, though she testified she did not receive these documents. She did receive a variety of notices concerning emission testing, and she did inquire about these notices at the testing station in February of 1989.

We find that the Secretary of State did mail warnings and notices of suspension of Nancy's driver's license to the Streamwood address that she provided to the Secretary of State as her current address at the time, and had sent at least one notice in July of 1988 to the Park Ridge address. Nancy testified that she moved sometime between the summer and September to the Streamwood address. The August notice was mailed to the Streamwood address. The Secretary of State would have gotten this address when she moved and notified the Secretary of an address change. Of course, the suspension notice went to the Streamwood address in October of 1988. Though Nancy states that she received only emission notices, which would have to have been for both VIN numbers to have caused confusion, we find that the warnings of her license suspension were sent to both her Park Ridge and Streamwood addresses, and the suspension itself was properly certified as mailed to her at her Streamwood address, and, thus, constituted notice to her, even if she did not receive it. 625 ILCS 5/6—21(c).

In order for the State to be liable to Nancy, it must

have owed a duty to her, and been negligent in the performance of the duty, and such negligence must have been at least 50% of the proximate cause of the damages suffered that are compensable under the law. *Stanley v. State* (1985), 39 Ill. Ct. Cl. 107; *Berger v. State* (1988), 40 Ill. Ct. Cl. 120; *Wilson v. State* (1989), 41 Ill. Ct. Cl. 50; 735 ILCS 5/2—1176.

The Claimant argues that the State owed a duty to Nancy to ensure that the information in its records was accurate, and that duty was breached when the State mishandled its own internal correction procedures, and created two files on Nancy's automobile.

We believe that the Claimant has misidentified the duty owed to Nancy. Even though the State made an internal error nothing happened that was prejudicial to Nancy until the State suspended her driver's license. At that time the State had a duty to inform Nancy that her license was being suspended. The State fulfilled its duty by sending to Nancy the statutory notices of suspension to her Park Ridge and Streamwood addresses, and the suspension itself to her Streamwood address, which she had provided to the Secretary of State. Nancy then had a duty to respond to the Secretary of State, and this duty was breached by her failure to respond to the Secretary of State. Under the law, Nancy was given notice, and her claim of not receiving any of the notices does not change that.

We find that the State breached no duty to Nancy in the circumstances of this claim. Additionally, we find that Nancy's breach of her duty was the proximate cause of her arrest. Thus, the State is not liable for damages to Nancy. As William's damages are derivative from any liability by the State to Nancy, his claim is denied, also.

If for the sake of argument, the State was found to

have a duty to Nancy and be 50% of the proximate cause, it is apparent that Nancy's damages would be limited under the law.

Nancy has no cause of action against the State for false arrest, imprisonment, or detainment, as an element of such a cause of action is that the arresting officer acted unreasonably when he made the arrest. In this claim, the State did not make the arrest, and the actions of the Federal park police seem reasonable in light of the information given them. See *Howard v. State* (1993), 45 Ill. Ct. Cl. 214 for a thorough discussion of false arrest, imprisonment, etc.

Additionally, this Court cannot award Nancy damages for emotional or mental distress, as under Illinois law awards for emotional and mental distress cannot be made without physical injury to the Claimant. *Carlinville National Bank v. Rhoades*, 63 Ill. App. 3d 502, 380 N.E.2d.

Nancy's brief cites two cases in attempting to get around the rule of law requiring that emotional injury can be compensable only if accompanied by physical injury.

First, she cites *Davenport v. DiRobertis* (1987), 653 F. Supp. 649 (N.D. Ill.) for the proposition that it is possible to undergo confinement and suffer compensable emotional damages. However, as the Respondent's brief points out, Davenport involved inmates who had been in segregation for 90 days and spoke of "isolation in solitary confinement" causing compensable emotional damages.

Nancy was not in solitary confinement for 90 days, but was in a local jail for one night.

Second, Nancy cites *Levka v. City of Chicago* (1984), 748 F.2d 421. *Levka* is a strip search case involving intentional abuse of the arrestee, which is an exception to the general rule that physical injury must accom-

pany emotional damages. The conduct of the State towards Nancy was not intentional.

There was some mention in the record that Nancy lost out on a job because of her suspension, but this was not further developed and fails as a ground of recovery for lack of proof.

Thus, even if we had found the State to have had a duty to Nancy and to have been 50% of the proximate cause, Nancy's damages under the law would have been minimal.

This Court very much sympathizes with the plight in which Nancy found herself. None of us would like to be arrested, spend a night in jail, and then be sent a letter apologizing for the "inconvenience." However, this Court must follow the law, and we have seen the bulk of Nancy's claimed damages are not compensable under the law even if the State had been liable.

It is therefore ordered that this claim is denied and dismissed.